**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LAWRENCE H. GRESS, on behalf of himself and others similarly situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>COMMONWEALTH EDISON COMPANY, an Illinois corporation; JOHN DOES 1-100, )<br><br>Defendants. )<br>_____ ) | Case No.:_____<br><br>Judge _____ |

## CLASS ACTION COMPLAINT

1.      Plaintiff, Lawrence H. Gress ("Gress"), by and through his attorneys, KENT MAYNARD & ASSOCIATES LLC and LEONARDMEYER LLP, and on behalf of himself and all electricity consumers in the service territory of Commonwealth Edison Company ("ComEd"), during the time period after passage of the Energy Infrastructure Modernization Act (220 ILCS 5/16-107.5, 16-108.5, 16-108.6, 16-108.7 and 16-111.SB) (the "Smart Grid Act" or "EIMA").("the Time Period") who paid delivery services charges to ComEd, alleges as follows as his Complaint against Defendants, ComEd and John Does 1 through 100:

**NATURE OF THE CASE**

2.      Plaintiff brings this action, individually and on behalf of a Class consisting of all electricity consumers located in the service territory of ComEd ("the Territory") who, during the Time Period, paid delivery services charges to ComEd, in order to recover damages for ComEd's

violation of the Federal Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. §§ 1961 through 1968 (2006)) ("RICO").

3.      The ComEd service territory at issue in this case ("Territory") consists of approximately 11,411 square miles in Northern Illinois, stretching from the Wisconsin border on the north, as far south as Pontiac, Illinois, and from the Indiana border west to the Mississippi River.

4.      Recently, it has been revealed that ComEd was infiltrated and induced to commit serial violations of RICO, and to otherwise engage in fraud, most notably by corruptly hiring connected "lobbyists" at the behest of Michael J. Madigan ("Madigan"), the Speaker of the Illinois House of Representatives and an elected member of that body.

5.      At all times pertinent hereto, the bribes were paid by ComEd in various forms to corruptly induce the Illinois General Assembly to approve various legislative initiatives that benefitted ComEd and wrongfully deprived ComEd ratepayers of property by artificially increasing their costs of electricity.

6.      Defendant ComEd, with its headquarters and principal place of business located in Chicago, is the largest utility company in Illinois.

7.      ComEd has been, and continues to be, subject to extensive regulation by the State of Illinois, including the General Assembly.

8.      In performing regulatory oversight of ComEd, the Illinois General Assembly routinely considered bills and passed legislation that had a substantial positive impact on ComEd's operations and profitability, including legislation that affected the regulatory process used to determine the rates ComEd may charge customers for the delivery of electricity.

9.     One enactment that affected the regulatory process used to determine the rates ComEd may charge customers for the delivery of electricity was passed in 2011, the Energy Infrastructure Modernization Act (220 ILCS 5/16-107.5, 16-108.5, 16-108.6, 16-108.7 and 16-111.SB) (the "Smart Grid Act" or "EIMA").

10.     The Smart Grid Act allowed, for the first time, electric utilities, including ComEd, to use a formulaic rate-setting process, where rate increases were made automatically, subject to the approval of the Illinois Commerce Commission (the "ICC"), as distinct from the traditional rate-making proceedings before the ICC.

11.     For the first time, ComEd was permitted to file its capital plans under formula rate updates that gave the ICC little power to alter them, beyond reviewing the capital spending after the fact for impropriety or waste.

12.     The Smart Grid Act exacted an intolerable price for some technological upgrades because it effectively relegated the ICC to "rubber-stamping" rate increases of ComEd *after* they had been made.

13.     Not surprisingly, without meaningful ICC oversight, the Smart Grid Act resulted in substantially higher rates paid for electricity by consumers in ComEd's Territory.

14.     On or about December 5, 2012, the ICC found that ComEd had violated the Smart Meter Deployment Order by unilaterally delaying its deployment of Smart Meter Infrastructure, including the installation of smart meters. *See* Order on Rehearing, ICC Docket No. 12-0298, December 5, 2012, pg. 33.

15.     ComEd's unilateral decision to delay deployment of Smart Meter Infrastructure, in open defiance of the ICC's Smart Meter Deployment Order, damaged ComEd customers in the

Territory by $182,000,000. *See* ICC Docket No. 12-0298, testimony Mr. A. Trump, ComEd Exh. 17.0 REV, at pg. 11, lines 230-36.

16.    However, the delay-related damage done to ComEd ratepayers in the Territory was dwarfed by the damage done to them by the automatic rate increases ushered in by the Smart Grid Act, which enactment was procured corruptly by bribing Madigan and his associates.

17.    ComEd maintained a continuing interest in advancing legislation in the Illinois General Assembly favorable to its interests in the Territory, and opposing legislation that was not consistent with its operational and financial success – all to the detriment of the Plaintiff Class Members in this action.

18.    As Speaker of the House of Representatives, Madigan was able to select, or not, the measures called for a vote in the Illinois House of Representatives.

19.    Madigan also exercised substantial influence and control over fellow lawmakers concerning legislation, including legislation affecting ComEd.

20.    Beginning no later than 2011, with the corruptly-induced passage of the Smart Grid Act, and continuing through in or around 2019, in the Northern District of Illinois and elsewhere, ComEd corruptly gave, offered, and agreed to give things of value, namely, jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts, for the benefit of Madigan and his hand-picked associates, with the intent to influence and reward Madigan, as an agent of the State of Illinois, a State government that during each of the twelve-month calendar years from 2011 to 2019, received federal benefits in excess of $10,000, in connection with any business, transaction, and series of transactions of $5,000 or more of the State of Illinois, namely, legislation affecting ComEd and its business, in violation of Title 18, United States Code, Section 666(a)(2).

21.     Beginning no later than 2011 and continuing through 2019, ComEd, along with its members and "lobbyists," created and conducted, in collaboration with Madigan, his hand-picked associates, and other public officials, a racketeering conspiracy that corruptly used bribery to create a "money machine" that would automatically generate millions of dollars in revenue for ComEd, revenue that would result in unmerited tributes paid to the Defendants.

22.     Plaintiff brings this action against Defendants, individually and on behalf of a Class, for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.§§1961 *et seq.*, in particular, §§1962(c),(d); and 1964, which violations were committed by perpetrating a scheme through an enterprise specifically designed to defraud Plaintiff and the Class out of millions of dollars in rate increases that were corruptly and wrongfully assessed as a direct and proximate result of bribes paid to public officials.

23.     The Plaintiff Class consists of persons who paid higher electricity rates after the passage of the Smart Grid Act was procured through bribes paid to public officials in various forms, including, without limitation, bribes paid directly or indirectly to Madigan or for his benefit.

24.     The relief sought herein includes the disgorgement by ComEd and the persons bribed by ComEd, directly and indirectly,  of the marginal cost of electrical services paid by ComEd customers after the Smart Grid Act was corruptly passed as a remedy for the damages caused by Defendants' violations of 18 U.S.C. §§1962(c) and (d) and 1964.

25.     Defendants have violated 18 U.S.C. §§1962(c) and (d) and 1964 by actively participating in the association-in-fact enterprise conducted by Defendants to corrupt with bribes paid to public officials directly or indirectly, including Madigan, who agreed to act as a champion of legislation favorable to ComEd in the Illinois General Assembly in exchange for bribes and things of value.

## JURISDICTION AND VENUE

26.     The subject matter jurisdiction of this Court is conferred and invoked pursuant to

28 §1331, and the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 §961, *et seq.*

(specifically 18 U.S.C. §1964(c)).

27.     This Court also has jurisdiction over this action as a class action pursuant to the

Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), providing for jurisdiction where, as here,

"any member of a class of plaintiffs is a citizen of a State different from any defendant," and the

aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interests

and costs. *See* 28 U.S.C. §§1332(d)(2) and (6).

28.     Venue is proper in this judicial district under 18 U.S.C. §1965(a) and 28 U.S.C.

§1391(a), (b), and (c) because a substantial part of the events and omissions giving rise to this

action occurred in the Northern District of Illinois and because Defendants transacted business in

this district.

## PARTIES

29.     Plaintiff, LAWRENCE H. GRESS, is an individual who was, at times relevant

hereto, a citizen of Illinois, whose address and service location is 1125 61st Street, Downers Grove,

IL 60516. At all relevant times, Mr. Gress resided in ComEd's Territory.

30.     Plaintiff GRESS and the Class Members are persons who resided in ComEd's

Territory and who purchased electricity from ComEd at rates that increased after the passage of

the Smart Grid Act. This enactment owes its existence to bribes paid directly or indirectly to

Madigan and other public officials.

31.     Plaintiff GRESS and the Class Members have residences, businesses, or other

facilities located in ComEd's Territory during the time period relevant to this action, they received

electricity delivery service from ComEd, and they are persons who paid the increases in electricity rates set automatically to incept by the Smart Grid Act. The majority of the Class Members are residents of Cook County, Illinois.

32.     Defendant COMED is a public utility regulated by the ICC pursuant to the Illinois Public Utility Act, 220 ILCS 5/3-105; 220 ILCS 5/1-102, *et seq*. ComEd has monopoly control of the delivery of electricity to all residential, business and governmental customers in the Territory. During all relevant time periods, ComEd provided electricity delivery services to approximately 3.8 million customer accounts across Northern Illinois, which includes about 70% of the population of the State of Illinois.

33.     COMED's principal place of business is located at 440 South LaSalle Street, Chicago, Cook County, Illinois. COMED is a wholly-owned subsidiary of Exelon Corporation ("Exelon"), a company whose stock is publicly traded. DOES EXELON NEED TO BE NAMED TOO???

34.     Madigan is a citizen and resident of the State of Illinois and this District, who was, at all relevant times, the Speaker of the House in the Illinois General Assembly. Beginning in at least January 2011, he solicited and received bribes and other things of value, directly and indirectly, to ensure the passage of the Smart Grid Act, an Act that increased electricity costs to ComEd customers for no countervailing benefit.

35.     Defendants, JOHN DOES 1-100, are citizens and residents of the State of Illinois, who were members of the network of "lobbyists" who paid and received bribes, directly and indirectly, to influence the Illinois General Assembly to pass legislation that favored ComEd and disfavored ComEd customers – the Class Members. The specific identities of these individuals is presently unknown.

## THE RICO ENTERPRISE

36.     The RICO "Enterprise" for purpose of this action is an association-in-fact of ComEd executives, employees, and "lobbyists" as well as Madigan and other current and former public officials in the General Assembly and other governmental entities with oversight authority over ComEd.

37.     Defendants and their above-referenced co-conspirators conducted or actively participated in the conduct of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

38.     Alternatively, Defendants, their co-conspirators, and other Enterprise participants identified herein, through an agreement to commit two or more predicate acts, conspired to conduct or participate in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(d).

39.     The actions of Defendants, their co-conspirators, and other Enterprise participants were in furtherance of the Enterprise and in violation of 18 U.S.C. §1962(d).

40.     The Enterprise was distinct from, and had an ongoing existence distinct from, that of Defendant ComEd, and acts through its members and the other Defendants.

41.     More specifically, participants in the Enterprise included:

    a.    <u>MICHAEL J. MADIGAN</u>: the Speaker of the House in the Illinois General Assembly who, in that capacity, used his position to solicit bribes, directly and indirectly, from ComEd and various ComEd "lobbyists" in exchange for procuring legislation that would permit ComEd to increase rates charged to ComEd customers and thus enrich ComEd managers whose compensation was based on apparent profitability and ComEd "lobbyists."

      b.      <u>JOHN DOES 1-100</u>: participated in the scheme by, *inter alia*, acting as purported ComEd "lobbyists" as a means of giving things of value, directly or indirectly, to corrupt public officials in the performance of their duty and to induce Madigan and other public officials to influence or approve by legislative enactments that generated benefits to members of the conspiracy, to the detriment of the Plaintiffs.

42.     Various other persons, firms, organizations, corporations and business entities, have participated as co-conspirators in the violations and conduct alleged herein and performed acts in furtherance of the conspiracy described herein.

## CLASS ALLEGATIONS

43.     Plaintiff, Mr. Gress, brings this action under the Rules of Civil Procedure, for himself and as the representative of a class of similarly situated plaintiffs, defined as:

> All persons who paid money to ComEd for electricity delivered to them by ComEd at rates that increased after the passage of the Smart Grid Act was procured through fraud, bribery, and public corruption.

44.     Prosecution of this case by way of a class action is a superior method of resolving these claims, as the average amount at issue here is relatively small.

45.     Any individual Class Member's out-of-pocket and opportunity costs of challenging a fee increase is substantially greater than the cost of the wrongfully assessed fees.

46.     Total damages suffered by the Plaintiff Class Members are sizable; the incremental cost of electricity paid by ComEd customers after the passage of the Smart Grid Act is many millions of dollars.

47.     Upon information and belief, the total damages suffered by the Plaintiff Class exceeds $150,000.00 ($150 million).

48.     The class of Plaintiffs in this class is so numerous that joining them individually would be impracticable.

49.     Upon information and belief, the Plaintiff Class may exceed 100,000 members, who can be readily ascertained by digital records generated and maintained in the ordinary course of business by the various RLC providers and Defendant ComEd.

50.     The claim of the named Plaintiff is typical of those of all members of the proposed Plaintiff Class, as required by Rule 23(a)(3), in that they too paid increased electricity rates that were corruptly and wrongfully induced at higher costs as a direct and proximate result of bribes paid directly or indirectly to Madigan to improperly influence him the General Assembly.

51.     Numerous questions of law and fact exist are common to the Plaintiff and the Class. The answers to these common questions are significant and will substantially advance the adjudication and resolution of this case, and predominate over any questions that may affect only individual Class members, thereby satisfying Rule 23(a)(2) and 23(b)(3).

52.     These common question/common answer issues include:

a.      Whether ComEd misrepresented and concealed material information in its mailings to and filings with the Illinois Commerce Commission (ICC) concerning ComEd's justification for automatic rate increases after the Smart Grid Act was passed;

b.      Whether Defendants used or caused to be used the Unites States mail to convey to Class Members electric bills that they knew were based on data falsified or legislative enactments procured through public corruption and honest services fraud as distinct from any *bona fide* concern about improving customer service;

c.      Whether  ComEd engaged in a fraudulent and/or deceptive scheme to deceive ICC, citizens of Illinois, and the Illinois General Assembly as to the

true nature and purpose of the Smart Grid Act, and concealed the fact that the EIMA had been corruptly induced because of bribes, improper bullying and influence over ICC, and a desire to generate profits and, not to promote improved electrical service in northern Illinois;

d.     Whether Defendants engaged in a pattern and practice of disseminating materially false information, misrepresentations, omissions, and concealment regarding Defendants' support of the EIMA, including the false claim that the EIMA would benefit customers, instead of steadily increasing their electricity costs;

e.     Whether Defendants engaged in public corruption and the exchange of bribes in connection with the enactment of the EIMA;

f.     Whether the foregoing conduct continues to the present;

g.     Whether Defendants' conduct injured Class members in their businesses or property within the meaning of the RICO statute;

h.     Whether the Defendants violated and conspired with each other and others to violate RICO by the conduct of an association-in-fact Enterprise, through a pattern of racketeering activity involving bribery of public officials, honest services fraud, and mail and wire fraud;

i.     Whether Class members are entitled to compensatory damages and if so, the nature and extent of such damages; and

j.     Whether Class members are entitled to treble damages under Civil RICO.

53.     Plaintiff, like all of the Class members, has been damaged by Defendants' misconduct, in that, among other things, he has suffered the consequences of paying rate increases procured through fraud, as set forth in the Definition of Class.

54.     The factual and legal bases of Defendants' misconduct are common to all members of the Class and represent a common thread of fraud, deceit, and other misconduct resulting in injury to Plaintiffs and Class Members.

55.     Plaintiff will fairly and adequately represent and protect the interests of Class members, as required by Rule 23(a)(4).

56.     Plaintiff and his counsel are committed to the vigorous prosecution of this action on behalf of the Class and have the financial resources to do so.

57.     Neither Plaintiff nor his counsel has any interest adverse to the Class.

58.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3).

59.     Absent a class action, most Class members would certainly find the cost of litigating their claims to be prohibitive, and would thus have no effective access to the courts or remedy at law.

60.     The class treatment of common questions of law and fact is thus superior to multiple individual actions or piecemeal litigation inasmuch as common questions of law and fact substantially predominate over any questions of law or fact unique to individual Class Members.

61.     The named Plaintiff will fully and adequately represent the interests of all members of the Plaintiff Class, and the damages suffered by the named Plaintiff, and the manner in which he was harmed, are wholly typical of the members of the Class.

62.     The named Plaintiff is represented by trial counsel, experienced and competent in all areas of law relating to this Complaint, who are prepared to fully and adequately prosecute this action on behalf of their clients and on behalf of all members of the Plaintiff Class, as Class Counsel.

63.     Plaintiffs anticipate that administration of this Class, however numerous, will proceed smoothly, aided by the fact that the Defendants have maintained detailed and comprehensive electronic records identifying all Class Members to whom they issued Violation Notices, as well as the date, time, and location of the infraction alleged in the Violation Notice.

64.     Plaintiffs seek the certification of a Class under their civil RICO claims, asserted for violations of 18 U.S.C. §1962(c) and 1962(d) under 1964(c) in this Complaint. All questions of law and fact are common to the civil RICO counts and predominate over individual questions. This case also presents common issues of fact and law that are each appropriate for issue-class certification under Rule 23 (c)(4), and the management of this action may be facilitated through the certification of additional subclasses under Rule 23(c)(5), if necessary and appropriate.

65.     The EIMA rate increases were procured not out of any concern about improved customer service, but rather as a direct result of greed and public corruption, and as a direct and proximate result of bribes paid directly or indirectly to Madigan and his purported "lobbyists" and cronies.

66.     Defendants should not be permitted to retain the tainted monetary fruits generated by their criminal conspiracy.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

67.     Efforts by ComEd and its parent company Exelon (collectively "ComEd") to curry favor in the Illinois General Assembly and with Speaker Madigan began in earnest after 2003, the year the General Assembly had rejected a rate hike that John Rowe, then CEO of Exelon, claimed was critically needed to complete the acquisition of troubled downstate utility company Illinois Power.

68. It was then publicly known that Madigan was withholding his support for ComEd's efforts.

69. ComEd intensified its efforts to increase its influence in the Illinois General Assembly and to improve its relationship with Madigan, in order to ensure favorable treatment of proposed rate hikes and bailouts related to two nuclear power plants located in Illinois in Clinton and the near the Quad Cities.

70. Madigan and other legislators in Springfield made it clear that, if ComEd wanted the General Assembly to support rate hikes, ComEd would have to start "playing ball" with Madigan and other key legislators.

71. Thereafter, direct and indirect payments of money and other things of value to Madigan and other influential legislators attributable to ComEd steadily increased as ComEd hired numerous politically-connected "lobbyists" to curry favor and act as bagmen for secret payments.

72. In 2011, ComEd's efforts first bore substantial fruit.

73. In 2011, the Illinois General Assembly effectively pushed aside the usual case-by-case regulatory hurdles for rate increases and pre-approved future rate hikes subject to a predetermined schedule.

74. In addition, the Illinois General Assembly gave its blessing to a $2 billion ratepayer-financed bailout of struggling nuclear power plants.

75. After 2011, ComEd continued "playing ball" with Madigan, among others, by making politically-motivated hires.

76. One of the politically-connected hires by ComEd made in exchange for favorable government actions in the General Assembly occurred in 2012.

77.     In 2012, Angie Sandoval ("Angie"), one of Senator Martin Sandoval's three children, was in need of a job.

78.     Sandoval, whose own rise to power had been fueled by corrupt hiring, made ComEd an offer that it could not refuse: hire Angie.

79.     ComEd was only too happy to oblige.

80.     In 2012, during Anna Pramaggiore's tenure as ComEd CEO, Angie went to work at ComEd, where she remains employed.

81.     Madigan and his fellow-racketeers have used their power as public officials to line their own pockets by infiltrating and corrupting both public and private enterprises subject to his power and selling secret and unlawful indulgences to the highest bidder.

82.     Long after the EIMA was passed in 2011, ComEd relied on ComEd to continue increasing ComEd's revenues by corrupting public officials.

83.     During the many years he has served as Speaker of the House in the Illinois General Assembly, Madigan has amassed considerable power, and had the power inherent in his position as Speaker to retard or push forward legislation that impacted ComEd's "bottom line."

84.     Madigan has, at all relevant times, wielded substantial oversight authority over ComEd.

85.     In the exercise of his authority over ComEd and its publicly-traded parent company, Exelon, Madigan had the discretion to support or oppose rate hikes and bailouts for ComEd.

86.     Madigan used his power as a public official to line his own pockets, directly or indirectly, by infiltrating and corrupting both public and private enterprises subject to his power and selling secret and unlawful indulgences to the highest bidder.

87.     On July 17, 2020, John R. Lausch Jr., the United States Attorney for the Northern

District of Illinois, filed a one-count criminal Information against ComEd.

88.     Count I of the Information states:

[Michael J. Madigan] was the Speaker of the House of Representatives and an elected member of that body. As Speaker of the House of Representatives, [Madigan] was able to exercise control over what measures were called for a vote in the House of Representatives. [Madigan] also exercised substantial influence and control over fellow lawmakers concerning legislation, including legislation affecting ComEd. 2. Beginning no later than in or around 2011, and continuing through in or around 2019, in the Northern District of Illinois, Eastern Division, and elsewhere, [ComEd], defendant herein, corruptly gave, offered, and agreed to give things of value, namely, jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts, for the benefit of [Madigan] and [Madigan]'s associates, with intent to influence and reward [Madigan], as an agent of the State of Illinois, a State government that during each of the twelve-month calendar years from 2011 to 2019, received federal benefits in excess of $10,000, in connection with any business, transaction, and series of transactions of $5,000 or more of the State of Illinois, namely, legislation affecting ComEd and its business [i]n violation of Title 18, United States Code, Section 666(a)(2).

89.     On July 17, 2020, ComEd announced that it had entered into a Deferred Prosecution

Agreement pursuant to which it agreed to pay a two-hundred million dollar ($200,000,000.00) fine

and admitted and stipulated to the following facts, which are incorporated and alleged herein in

support of the claims pled on behalf of the proposed class.

90.     ComEd is the largest utility company in Illinois. It employs over 6,000 individuals

and delivers electricity to approximately 70% of Illinois's population.

91.     It is a majority-owned subsidiary of Exelon Corporation and operates from its

headquarters located in Chicago.

92.     As a utility, ComEd is subject to extensive regulation by the State of Illinois.

93.     The State of Illinois regulates the rates that ComEd may charge its customers, as

well as the rate of return ComEd may realize from its business operations.

94.     The legislative branch of the State of Illinois, known as the Illinois General Assembly, has routinely considered bills and has passed legislation that has had a substantial impact on ComEd's operations and profitability, including legislation that affects the regulatory process ComEd uses to determine the rates ComEd charges its customers for the delivery of electricity.

95.     In order for legislation to become law, it must be passed by both houses of the Illinois General Assembly—the Illinois House of Representatives and the Illinois Senate.

96.     For example, in 2011, the General Assembly passed the Energy Infrastructure and Modernization Act ("EIMA").

97.     EIMA provided for a regulatory process through which ComEd was able to more reliably determine rates it could charge customers and, in turn, determine how much money it was able to generate from its operations to cover, among other things, costs for grid-infrastructure improvements.

98.     The passage of EIMA, therefore, helped improve ComEd's financial stability.

99.     The Illinois House of Representatives passed EIMA in or around May 2011, and by the Illinois Senate in or around August 2011. EIMA was then vetoed by the Governor of the State of Illinois.

100.    Thereafter, in or around October 2011, both houses of the Illinois General Assembly voted to override the Governor's veto. In 2016, the General Assembly passed the Future Energy Jobs Act ("FEJA"), which provided for a renewal of the regulatory process that was beneficial to ComEd.

101.    Since the passage of FEJA, ComEd has had a continuing interest in advancing legislation in the General Assembly favorable to its interests, and opposing legislation that was not consistent with its operational and financial success.

102.    Public Official A is the Speaker of the Illinois House of Representatives and the longest-serving member of the House of Representatives. ComEd understood that, as Speaker of the House of Representatives, Public Official A was able to exercise control over what measures were called for a vote in the House of Representatives and had substantial influence and control over fellow lawmakers concerning legislation, including legislation that affected ComEd. Public Official A was an agent of the State of Illinois, a State government that, during each of the twelve-month calendar years from 2011 to 2019, received federal benefits in excess of $10,000.

103.    Individual A served in the Illinois House of Representatives for approximately ten years, beginning in 1972.

104.    After Individual A's service in the Illinois House of Representatives, Individual A served as a lobbyist and/or consultant for ComEd until 2019.

105.    During that time, Individual A made known to ComEd that Individual A had a close personal relationship with Public Official A.

106.    CEO-1 was the chief executive officer of ComEd between in and around March 2012 and May 2018. From June 1, 2018, to October 15, 2019.

107.    CEO-1 served as a senior executive at Exelon Utilities and had oversight authority over ComEd's operations.

108.    Senior Executive 1 served as ComEd's senior vice president for legislative and external affairs from in or around March 2012 until in or around September 2019.

109.    Lobbyist 1 served as ComEd's executive vice president of legislative and external affairs from in and around 2009 until Lobbyist 1's retirement in and around 2012.

110.    From 2012 to 2019, Lobbyist 1 served as an external lobbyist for ComEd.

111.    Consultant 1 was the owner of Company 1, which performed consulting services for ComEd until in and around 2019.

112.    From in or around 2011 through in or around 2019, in an effort to influence and reward Public Official A's efforts, as Speaker of the Illinois House of Representatives, to assist ComEd with respect to legislation concerning ComEd and its business, ComEd arranged for various associates of Public Official A, including Public Official A's political allies and individuals who performed political work for Public Official A, to obtain jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts from ComEd, even in instances where certain political allies and workers performed little or no work that they were purportedly hired to perform for ComEd.

113.    Beginning no later than in or around 2011, Public Official A and Individual A sought to obtain from ComEd jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts for various associates of Public Official A, such as precinct captains who operated within Public Official A's legislative district.

114.    In or around 2011, Individual A and Lobbyist 1 developed a plan to direct money to two of Public Official A's associates ("Associate 1" and "Associate 2") by having ComEd pay them indirectly as subcontractors to Consultant 1.

115.    Payments to Associate 1 and Associate 2, as well as later payments to other subcontracted associates of Public Official A, continued until in or around 2019, even though those associates did little or no work during that period.

116.    Consultant 1 agreed in 2011 that Public Official A's associates would be identified as subcontractors under Consultant 1's contract and that ComEd's payments to Consultant 1 would be increased to cover payments to those subcontractors.

117.    Between in or around 2011 and 2019, Consultant 1 executed written contracts and submitted invoices to ComEd that made it falsely appear that the payments made to Company 1 were all in return for Consultant 1's advice on "legislative issues" and "legislative risk management activities," and other similar matters, when in fact a portion of the compensation paid to Company 1 was intended for ultimate payment to Public Official A's associates, who in fact did little or no work for ComEd. Consultant 1 and Company 1 did little, if anything, to direct or supervise the activities of Public Official A's associates, even though they were subcontracted under and received payments through Company 1.

118.    Moreover, because they were paid indirectly through Company 1, the payments to Public Official A's associates over the course of approximately eight years were not reflected in the vendor payment system used by ComEd, and as a result, despite that Public Official A's associates were subcontracted under and receiving payments through Company 1, no such payments were identifiable in ComEd's vendor payment system.

119.    Certain senior executives and agents of ComEd were aware of these payments from their inception until they were discontinued in or around 2019.

120.    For example, in or around May 2018, Public Official A, through Individual A, asked CEO-1 to hire a political ally of Public Official A who was retiring from the Chicago City Council at the end of the month ("Associate 3").

121.    CEO-1, in coordination with Senior Executive 1 and Consultant 1, agreed that ComEd would pay Associate 3 approximately $5,000 a month indirectly as a subcontractor through Company 1.

122.    At the time CEO-1 approved this arrangement, CEO☐ A-6 1 was aware that there were other associates of Public Official A that were paid indirectly as subcontractors through Company 1, which CEO-1 referred to as the "roster." CEO-1 also agreed that Public Official A—rather than an officer or employee of ComEd or Company 1—would advise Associate 3 of this new arrangement.

123.    In or around June 2018, Company 1's contract was revised to include extra funding for the purpose of paying Associate 3.

124.    In seeking to justify the extra funding, Consultant 1 claimed falsely that an additional fee of $5,000 a month was necessary under Company 1's contract, in part because of Company 1's "expanded role with Cook County Board president's office and Cook County Commissioners and Department Heads," when in fact the additional $5,000 a month in compensation was intended for payment to Associate 3.

125.    ComEd approved of the additional payments to Company 1, knowing they were intended for Associate 3.

126.    Certain senior executives and agents of ComEd were also aware of the purpose of these payments to Public Official A's associates, namely, that they were intended to influence and reward Public Official A in connection with Public Official A's official duties and to advance ComEd's business interests.

127. For example, on or about May 16, 2018, Individual A explained to Senior Executive 1 why certain individuals were being paid indirectly through Company 1, by making reference to their utility to Public Official A's political operation.

128. Individual A identified Associate 1, one of the several individuals on Company 1's payroll, as "one of the top three precinct captains" who also "trains people how to go door to door so just to give you an idea how important the guy is."

129. On or about February 7, 2019, Individual A advised Senior Executive 1 about how to present information within ComEd concerning the renewal of Company 1's contract for 2019.

130. In the conversation, Individual A advised Senior Executive 1 that, "I would say to you don't put anything in writing," explaining later in the conversation because "all it can do is hurt ya." Individual A further advised Senior Executive 1 that, if asked by a ComEd official why Company 1 was being paid, Senior Executive 1 should explain that the associates of Public Official A were former ward committeemen and aldermen, that it was a "favor," and that it would be up to Consultant 1 to prove that Public Official A's associates performed work, not ComEd.

131. On or about February 11, 2019, Individual A had a conversation with Lobbyist 1, who by that time had retired from ComEd, but had continued to serve as a paid external lobbyist to ComEd.

132. In discussing how the renewal of Company 1's contract—which included significant payments to Company 1 to account for indirect payments to Public Official A's associates—should be communicated internally, Individual A said, "We had to hire these guys because [Public Official A] came to us.

133. It's just that simple." Lobbyist 1 agreed, and added, "It's, it's clean for all of us."

134.    On or about February 13, 2019, Consultant 1 advised Senior Executive 1 that Associate 1 and Associate 2 had been made "subcontractors" of Company 1 at the request of Lobbyist 1 and that Associate 3 was also currently being paid as a "subcontractor."

135.    Consultant 1 emphasized that he had told no one of the arrangement per instructions previously given to Consultant 1, and cautioned Senior Executive 1 that ComEd should not tamper with the arrangement because "your money comes from Springfield," and that Consultant 1 had "every reason to believe" that Individual A had spoken to Public Official A about the retention of Public Official A's associates, and knew Lobbyist 1 had done so.

136.    Consultant 1 added that Public Official A's associates "keep their mouth shut, and, you know, so.

137.    But, do they do anything for me on a day to day basis? No." Consultant 1 explained that these payments were made "to keep [Public Official A] happy, I think it's worth it because you'd hear otherwise."

138.    On or about March 5, 2019, Individual A and ComEd personnel participated in a meeting during which they discussed Company 1's contract and why the indirect payments to Public Official A's associates made under the guise of that contract should be continued for another year.

139.    During that meeting, Individual A explained that for decades, Public Official A had named individuals to be ComEd employees, such as meter readers, as part of an "old-fashioned patronage system."

140.    In response, a ComEd employee acknowledged that such hires could be a "chip" used by ComEd.

141.    On or about March 6, 2019, Individual A and Lobbyist 1 discussed the renewal of Company 1's contract.

142.    During the conversation, Lobbyist 1 explained that "with the [Consultant 1] stuff, you got a little leg up," to which Individual A agreed.

143.    Lobbyist 1 later added, "I mean it's uh, unmentioned, but you know, that which is understood need not be mentioned." Individual A responded, "Right. Exactly. Exactly."

144.    Between in and around 2011 and 2019, indirect payments made to Public Official A's associates—who performed little or no work for ComEd—totaled approximately $1,324,500.

145.    These indirect payments were made not only through Company 1 but through other additional third-party vendors.

146.    As with Company 1, these other third-party vendors entered into contracts with ComEd that noted that the payments made to these vendors by ComEd were for consulting and related services when in truth, a substantial portion of the money paid to these vendors was intended for Public Official A's associates, who did little or no work for ComEd.

147.    These payments, like those made indirectly through Company 1, were intended to influence and reward Public Official A in connection with the advancement and passage of legislation favorable to ComEd in the Illinois General Assembly.

148.    Prior to ComEd's discovery of the federal law enforcement investigation, Public Official A's and Individual A's approval was sought by ComEd before payments to certain of Public Official A's associates were discontinued, even though these individuals performed little or no work for ComEd.

149.    As with the payments made to Public Official A's associates through Company 1, despite that Public Official A's associates were subcontracted under and receiving payments

through these third-party vendors, no such payments were identifiable in ComEd's vendor payment system.

150. Certain former ComEd executives designed these payment arrangements in part to conceal the size of payments made to Public Official A's associates and to assist ComEd in denying responsibility for oversight of Public Official A's associates, who performed little or no work for ComEd.

151. Appointment of Board Member 1 as Member of the Board of Directors at the Request of Public Official A Beginning in or around 2017, Public Official A sought the appointment of an associate to the ComEd Board of Directors (hereinafter referred to as "Board Member 1").

152. Public Official A's request was communicated by Individual A to CEO-1.

153. In or around May 2018, in response to internal company opposition to the appointment of Board Member 1, CEO-1 asked Individual A if Public Official A would be satisfied if CEO-1 arranged for Board Member 1 to receive a part-time job that paid an equivalent amount of money to a board member position, namely, $78,000 a year.

154. Individual A told CEO-1 that Public Official A would appreciate if CEO-1 would "keep pressing" for the appointment of Board Member 1, and CEO-1 agreed to do so.

155. In or around September 2018, CEO-1 (who by this time had been promoted to an executive position within Exelon Utilities, in which capacity CEO-1 maintained oversight authority over ComEd) assured Individual A that CEO-1 was continuing to advocate for the appointment of Board Member 1 made at Public Official A's request because "You take good care of me, and so does our friend [Public Official A] and I will do the best that I can to, to take care of you."

156.    On or about April 25, 2019, CEO-1 advised Individual A by text message, "Just sent out Board approval to appoint [Board Member 1] to ComEd Board."

157.    The following day, April 26, 2019, ComEd filed a notice with the United States Securities and Exchange Commission stating that Board Member 1 had served as a director of ComEd since April 2019.

158.    Although ComEd and Exelon conducted due diligence on Board Member 1 and ultimately determined he was qualified for a Board position, no one at ComEd or Exelon recruited Board Member 1 to serve as a director, and ComEd did not interview or vet other outside candidates for the vacant board seat.

159.    ComEd appointed Board Member 1, in part, with the intent to influence and reward Public Official A in connection with Public Official A's official duties.

160.    Retention of Law Firm A In or around 2011, ComEd agreed to retain Law Firm A and entered into a contract pursuant to which ComEd agreed to provide Law Firm A with a minimum of 850 hours of attorney work per year.

161.    This contract was entered into with Law Firm A, in part, with the intent to influence and reward Public Official A in connection with Public Official A's official duties and because personnel and agents of ComEd understood that giving this contract to Law Firm A was important to Public Official A.

162.    In 2016, Law Firm A's contract was up for renewal.

163.    As part of renewal discussions, personnel within ComEd sought to reduce the hours of legal work they provided to Law Firm A from the 850 hours specified in the 2011 retention agreement because ComEd paid only for hours worked and there was not enough appropriate legal work to give to Law Firm A to fill 850 annual hours.

164.    Thereafter, an attorney associated with Law Firm a [Lawyer A] complained to Individual A about ComEd's effort to reduce the amount of work provided to Law Firm A.

165.    On or about January 20, 2016, Individual A contacted CEO-1 and wrote, "I am sure you know how valuable [Lawyer A] is to our Friend [Public Official A]," and then went on to write, "I know the drill and so do you.

166.    If you do not get involve [sic] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend [Public Official A].

167.    Our Friend [Public Official A] will call me and then I will call you.

168.    Is this a drill we must go through?" CEO-1 replied in writing, "Sorry. No one informed me. I am on this."

169.    Thereafter, CEO-1 tasked a ComEd employee, who was assigned as a "project manager" to assist with the project of obtaining legislative approval of FEJA, to ensure that Law Firm A's contract was renewed.

170.    The project manager had no oversight authority over ComEd's legal department and was not otherwise involved in deciding what legal professionals the legal department retained.

171.    The project manager was assigned the task of ensuring Law Firm A's contract was renewed because the work provided to Law Firm A was, in part, designed to influence and reward Public Official A in connection with Public Official A's official duties, including the promotion and passage of FEJA.

172.    ComEd agreed in or around June 2016 to renew Law Firm A's contract with substantially reduced annual hours.

173.    Beginning no later than 2013, and continuing until in or around 2019, ComEd operated an internship program.

174.    As part of the program, ComEd would accept a specified target number of students who primarily resided in a Chicago ward that Public Official A was associated with ("Public Official A's Ward") and that were recommended to ComEd by associates of Public Official A, including Individual A.

175.    ComEd hired students from Public Official A's Ward, in part, with the intent to influence and reward Public Official A in connection with Public Official A's official duties.

176.    Benefit to ComEd Between in or around 2011 and in or around 2019, during the same time frame that ComEd was making payments to Public Official A's associates, and extending other benefits for the purpose of influencing and rewarding Public Official A, ComEd was also seeking Public Official A's support for legislation that was beneficial to ComEd, including EIMA and FEJA, that would ensure a continued favorable rate structure for ComEd.

177.    ComEd acknowledges that the reasonably foreseeable anticipated benefits to ComEd of such legislation exceeded $150,000,000.

### COUNT I
### VIOLATION OF 18 U.S.C. §1962(C)

178.    Plaintiffs incorporate by reference all preceding paragraphs.

179.    Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by . . . any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

180.    Defendants and their co-conspirators, as identified herein, are "persons" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

181.     The Enterprise was engaged in, and the activities of the Enterprise affect, interstate commerce, as citizens of other states are among the Class members.

182.     Instrumentalities and channels that serve as media for the movement of goods and persons in interstate commerce may operate within a particular State as a link in a chain or system of conduits through which interstate commerce moves and, as such, need not extend across State lines.

183.     Furthermore, and in any case, a substantial part of the acts described herein, including the predicate acts of mailing and acts of various Enterprise participants, affected interstate commerce.

## **The Enterprise**

184.     The association-in-fact Enterprise consists of Defendant ComEd, as well as Madigan, along with the other unnamed Defendant Jane Does, as well as any of Defendants' officers, employees, and agents, among others, who  participated in the scheme.

185.     The Defendants created, controlled, and conducted the Enterprise to develop and effectuate every aspect of the scheme, as alleged above.

186.     The conduct of Defendants was intended to increase ComEd revenues not to benefit ComEd per se, but rather to trigger incentive compensation payments to various ComEd executives, whose compensation was tied to the profitability of ComEd.

187.     Defendants created and/or used this association-in-fact Enterprise – an ongoing organization functioning as a continuing unit – as a separate entity and tool to effectuate the pattern of racketeering activity that damaged the Class by subjecting electricity rates to automatic increases on the demonstrably false pretense that they were needed to promote the public good as distinct from sheer greed.

188.    The Defendants exercised ongoing and continuous control over the Enterprise, and participated in the operation or management of the affairs of the Enterprise, through the following instrumentalities:

      a.    asserting direct control over false, deceptive, and misleading information disseminated to the Illinois General Assembly regarding legislation or potentially affecting ComEd;

      b.    asserting direct control over the creation and operation of the elaborate scheme used to create a small army of "Lobbyists" and conceal the bribes that induced Madigan's support of ComEd and its corruptly-induced automatic rate hikes;

      c.    placing employees and/or agents in positions of authority and control in the Enterprise; and

      d.    mailing documents containing misrepresentations and omissions (including fee statements for corruptly-induced rate increases) to the Class.

189.    From its inception, the Enterprise had a clear decision-making hierarchy or structure, with ComEd, acting principally through Madigan, positioned at the top.

190.    ComEd paid its "Lobbyists," not as true employees, but rather as co-conspirators, intent on helping the Enterprise succeed in promoting the "money machine" ComEd had created and concealed, by misrepresentations and omissions, the corrupt source of ComEd's success.

191.    Though ComEd, Madigan, among others, exercised control over the Enterprise, all of the Enterprise's members are distinct from the Enterprise and its activity, and each exercised control over distinct functions of the Enterprise.

192.     The persons and entities comprising the Enterprise associated together for the common purpose of allowing ComEd to subvert and corrupt the operation of ICC and the General Assembly to promote and "protect" its ComEd money machine from any threat, including ICC actions that might tend to reduce ComEd's profitability and incentive compensation payouts to members and beneficiaries of the RICO Enterprise.

193.     The "Lobbyist" network corruptly developed by Madigan and the other Defendants, was designed to be invulnerable to regulation by ICC or legislative action, and to conceal the bribery of public officials, all as part of the scheme to defraud the Plaintiff and Class, reducing ComEd to a passive instrument of Defendants' racketeering activity, and together, constituting an alternative "enterprise" as that term is defined in 18 U.S.C. § 1961(4).

## **Pattern of Racketeering**

194.     This Complaint details the ongoing pattern of racketeering based on facts that are now known to Plaintiff and his counsel.

195.     It is filed without the benefit of discovery, which will almost certainly uncover many more predicate acts and further demonstrate the breadth and scope of the Enterprise's racketeering.

196.     The Enterprise - with ComEd at the hub, acting through Madigan and Pramagiorre, engaged in a pattern of racketeering activity.

197.     From no later than 2011and at least through 2019, Defendants and the Enterprise, as well as others known or unknown, being persons employed by and associated with ComEd and the other Defendants identified herein, engaged in activities that affected and affect interstate commerce, unlawfully and knowingly conducted or participated, directly or indirectly, in the

affairs of the Enterprise through a pattern of racketeering activity, that is, through the commission of two or more racketeering acts, as set forth herein.

198.    The foregoing pattern of racketeering activity is distinct from the Enterprise itself, which does not solely engage in the above-described acts.

199.    Defendants have conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes predicate acts indictable under 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1346 (deprivation of honest services through bribes and kickbacks) through the aforementioned actions.

200.    In implementing the fraudulent scheme, Defendants were aware that the ICC and the Illinois General Assembly depended on the honesty of ComEd and the other Defendants honestly to represent the basis for their rate hikes.

201.    As detailed above, the fraudulent scheme consisted of, *inter alia*: using mail fraud to enable ComEd (a) to obtain, exert, and deliberately misrepresent the Enterprise's corrupt control over ComEd; and (b) suppress and conceal the level of such control and support from the Illinois General Assembly and the citizens of the State of Illinois.

202.    The unlawful predicate acts of racketeering activity committed by Defendants had a common purpose, were related, and had continuity. From its inception, the Defendants' scheme depended upon concealing the breadth of ComEd's bribery of public officials.

203.    The Enterprise used the mail to create, execute and manage their scheme, acting in violation of 18 U.S.C. § 1341.

204.    The predicate acts committed by the Enterprise were and are similar, continuous, and related.

205.     ComEd's bribes to Madigan and "Lobbyists" were substantial and spanned multiple years.

206.     Conscious of the wrongfulness of its racketeering conduct, Defendants actively concealed from the Illinois General Assembly and others the true source of ComEd's increasing profitability after 2011.

207.     This consistent message - denying the breadth of its true corruption with the pretense that it was motivated by a desire to promote public safety - illustrates how the predicate acts of mail fraud were similar, continuous, and related.

208.     The scheme was calculated to ensure that Plaintiffs and the Class would suffer as Defendants artificially increased the profitability of ComEd to trigger incentive compensation payouts.

209.     The targets of the Enterprise and the ultimate victims of Defendants' scheme and predicate acts of mail fraud number in the many thousands, as discovery will reveal.

210.     Each fraudulent mailing of a fee statement issued by ComEd for increased electricity costs procured through fraud, and public corruption constitutes an act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

211.     Collectively, these violations, occurring over several years, are a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

212.     Each activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the Class.

213.     All predicate acts committed by Defendants, and the Enterprise are related and were committed with a common scheme in mind: to bilk Illinois citizens out of electricity fee increases

generated by bribing public officials and conceal those bribes and public corruption to ensure that the automatic fee increases would continue to generate mountains of cash.

214.     Defendants' conduct of the Enterprise was designed to, and succeeded in, defrauding the Illinois General Assembly and in ultimately depriving Plaintiffs and the Class of millions of dollars in electricity fee increases corruptly collected by ComEd and its catamites.

**COUNT II**
**VIOLATION OF 18 U.S.C. §1962(D) BY**
**CONSPIRING TO VIOLATE 18 U.S.C. §1962(C)**

215.     Plaintiffs incorporate by reference all preceding paragraphs.

216.     Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

217.     Defendants violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) Enterprise described previously through a pattern of racketeering activity. Defendants, co-conspirators, and Enterprise participants agreed to join the conspiracy, agreed to commit and did commit the acts described herein, and knew that these acts were part of a pattern of racketeering activity.

218.     Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiffs and the Class of money.

219.     The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that Defendant, co-conspirators, and Enterprise participants not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of

RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

220.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Class have been and are continuing to be injured in their business or property, as set forth more fully above.

## JURY DEMAND

Plaintiffs demand trial by jury on all claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all Class Members, respectfully request that this Court enter judgment in his favor and against Defendants and enter an Order:

A.    Authorizing, directing, and supervising the conduct of early and expedited discovery on the allegations of this Complaint;

B.    Awarding Plaintiffs and the Class treble (three times) their actual damages on their RICO claims, together with costs and reasonable attorneys' fees;

C.    Awarding Plaintiffs and the Class their costs and expenses in this litigation, including reasonable attorneys' fees and expert fees; and

D.    Awarding Plaintiffs and the Class such other and further relief as may be just and proper under the circumstances.

Dated this 28th day of July 2020.

Respectfully submitted,

LAWRENCE H. GRESS, on behalf of himself and others similarly situated,

| | |
|---|---|
| **By:/S/Kent Maynard, Jr.**<br>Kent Maynard, Jr.<br><br>**KENT MAYNARD & ASSOCIATES LLC**<br>53 W. Jackson Blvd., Suite 1240<br>Chicago, Illinois 60604<br>312.423.6586<br>312.878.1553 FAX | **By: /S/Michael I. Leonard**<br>Michael I. Leonard<br><br>**LEONARDMEYER LLP**<br>120 N. LaSalle Street<br>20th Floor<br>Chicago, Illinois 60602<br>312.380.6559<br>312.264.0671 FAX |