**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LAWRENCE H. GRESS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Nos. 20 C 4405, 20 C 4555, |
| | ) | 20 C 4980 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| COMMONWEALTH EDISON | ) | |
| COMPANY, and | ) | |
| EXELON CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

---

| | | |
|---|---|---|
| CITIZENS UTILITY BOARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 C 4405 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| COMMONWEALTH EDISON | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

From Greylord to guilty governors, the citizens of Illinois have suffered their share of corrupt behavior by elected government officials. This case involves more appalling behavior by an elected official; but, here, the defendant is not the government official who allegedly took the bribes but instead the two deep-pocketed corporations, Commonwealth Edison Company ("ComEd") and Exelon Corporation ("Exelon"), whose employees allegedly agreed to pay the bribes.

Plaintiffs Lawrence H. Gress ("Gress"), Steven Brooks, David Chavez, 1540 Milwaukee LLC, South Branch LLC, TFO Golub Burnham LLC, TFO Golub IT 2.0 LLC, Rockwell on the River LLC and Carmichael Leasing Co., Inc., believing that bribery led to the passage of several laws that resulted in increased rates for the electricity they purchased, filed a consolidated complaint [Docket 75], seeking relief from defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), as well as for conspiracy and unjust enrichment under Illinois law. Intervenor Citizens Utility Board ("CUB") filed a complaint in intervention with similar claims.[1] Defendants have filed a motion to dismiss. For the reasons set forth below, the Court grants the motion to dismiss.

I.      **BACKGROUND**

The following facts are from plaintiffs' complaint, and the Court takes them as true.

Defendant ComEd is a public utility regulated by the Illinois Commerce Commission ("ICC"). ComEd provides electricity-delivery services to about 3,800,000 customers. Defendant Exelon owns 99.985% of ComEd.

Plaintiffs allege that Michael Madigan ("Madigan") is the Speaker[2] of the Illinois House of Representatives, a position he has held since 1997 and also held from 1983 to 1995. He is also the Chairman of the Illinois Democratic Party, a position that: (a) he has held since 1998; and (b) allows him to "largely control" fundraising and endorsements of candidates. (Complt. ¶ 32/Docket 75 ¶ 32). He has been the Democratic committeeman for the 13th Ward since 1969.

---

[1] As CUB states in its brief, its claims are essentially the same as plaintiffs' claims, and it has adopted all of plaintiffs' arguments.
[2] The Court takes the alleged facts as true, without vouching for their veracity.

Plaintiffs allege Madigan led an old-school "patronage system," (Complt. ¶ 37), doling out favors and jobs.

Plaintiffs allege that Madigan has a long history of taking favors from ComEd. Plaintiffs allege that "for decades, Madigan had named individuals to be ComEd employees, in such positions as meter readers, as part of an 'old-fashioned patronage system." (Complt. ¶ 124(e)). Nonetheless, plaintiffs allege that defendants, for many years, "counted Madigan among their greatest foes." (Complt. ¶ 147). For example, plaintiffs allege that, in 2003, Madigan "torpedoed" a rate hike that ComEd wanted. (Complt. ¶ 147).

Defendants changed their luck with Madigan, beginning in 2011. Specifically, plaintiffs allege that, between 2011 and 2019, defendants bribed Madigan by providing three favors: 1) ComEd made payments of more than $1,000,000.00 to Madigan cronies; 2) ComEd gave legal work to a law firm that was run by a Madigan crony and that donated more than $100,000.00 to funds controlled by Madigan; and 3) ComEd gave a seat on its Board of Directors to a Madigan crony.

### Payments to Madigan cronies

According to plaintiffs, Madigan was assisted in his efforts to obtain bribes from ComEd by Michael McClain ("McClain"), Madigan's long-time friend. Plaintiffs describe McClain as one of Madigan's "clos[est]" and "most loyal" associates. (Complt. ¶ 45). McClain, like Madigan, served in the Illinois House of Representatives from 1972 to 1982. Plaintiffs allege that McClain has performed consulting and lobbying work for ComEd for many years and that he acts as a "trusted line of communication" between ComEd and Madigan. (Complt. ¶ 51).

Plaintiffs allege that in or about 2011, Madigan and McClain sought ComEd jobs, vendor subcontracts and payments. At about the same time, McClain and John Hooker ("Hooker"), who

was, at the time, ComEd's Executive Vice President of Legislative and External Affairs, "developed a plan" to direct money to three Madigan cronies through a consulting firm. (Complt. ¶ 116). That consulting firm was Jay D. Doherty & Associates, which is owned by Jay Doherty ("Doherty"). The three cronies were: Edward Moody ("Moody"), Frank Olivo, Jr. ("Olivo") and Ray Nice ("Nice"). Between 2011 and 2018, ComEd paid Jay D. Doherty & Associates $3,100,000.00.

The three cronies were long-time associates of Madigan. Moody has been associated with Madigan since he knocked on doors for Madigan as a teenager. He later became a precinct captain and worked as a Cook County Commissioner. Moody has been the Cook County Recorder of Deeds since December 2018. Olivo, too, has long been associated with Madigan. In the late 1960's, when Olivo was 18, he became a precinct captain. At some point, Madigan arranged for Olivo to be appointed Streets and Sanitation Superintendent for the 13th Ward. In 1994, at Madigan's request, then-Mayor Daley appointed Olivo to be 13th Ward Alderman, a position Olivo held until he retired in 2011. After his retirement until sometime in 2019, Olivo received payments as a lobbyist for ComEd. Similarly, Nice had a long relationship with Madigan. Nice was (or had been) a precinct captain in the 13th Ward. He was, at some point, a Deputy Recorder of Deeds for Cook County and, from 2013 to 2017, had a seat on the Employment Security Board of Review.

Plaintiffs allege that, from about 2011 until about 2019, ComEd gave money—indirectly through Jay Doherty & Associates—to Moody, Ovilo and Nice. Plaintiffs allege these three did "little or no work" in exchange for the money. (Complt. ¶ 120).

Those payments to Madigan's cronies via the consulting firm were not the only such payments alleged in the complaint. Plaintiffs allege that in May 2018, Madigan, via McClain,

asked Anne Pramaggiore ("Pramaggiore")—who was, at the time, the Senior Executive Vice President and CEO of Exelon Utilities—to hire Michael Zalewski ("Zalewski"). Zalewski had been Alderman of the 23rd Ward from May 1995 until he retired in May 2018. (At some point, Madigan helped Zalewski's daughter become Chair of the ICC, which regulates ComEd.) Pramaggiore, together with Doherty and another ComEd employee (Fidel Marquez), agreed that ComEd would pay Zalewski $5,000 per month via Jay Doherty & Associates. ComEd's contract with Jay Doherty & Associates was changed in June 2018 to increase the monthly payments to the consulting firm by $5,000.00.

### *Legal work*

Plaintiffs allege that ComEd also agreed to give legal work to a Madigan crony. Specifically, in or around 2011, ComEd agreed to retain the law firm of Reyes Kurson to perform a minimum of 850 hours of work per year for ComEd. ComEd agreed to this in order "to influence and reward" Madigan. (Complt. ¶¶ 117-118). A partner in the Reyes Kurson firm was Victor Reyes ("Reyes"), who has donated more than $100,000 to "funds controlled by Madigan" and about $883,633.92 to the Democratic Party since 2005. (Complt. ¶ 80).

In or about 2016, some ComEd employees tried to give less work to Reyes Kurson, because the firm provided "little or no legal work of value." (Complt. ¶ 135(c)). Reyes complained to McClain, who wrote to Pramaggiore. McClain wrote, "If you do not get involve[d] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend [Madigan]. Our Friend [Madigan] will call me and then I will call you." (Complt. ¶ 135(c)). Pramaggiore responded that she was "on this." (Complt. ¶ 135(c)).

5

### Board seat

In or about 2017, Madigan sought to have Juan Ochoa ("Ochoa") appointed to the ComEd Board of Directors. Plaintiffs allege that Ochoa has "served Madigan for many years," but the complaint contains few details. Plaintiffs allege Ochoa was the head of the Metropolitan Pier and Exposition Authority from 2007 to 2010. Since 2010, he has been the CEO of a facilities management company. At some point, Ochoa granted a raise to the daughter of a former state senator as a favor to Madigan.

Madigan had McClain ask Pramaggiore to place Ochoa in a seat on ComEd's Board of Directors, a position that paid $78,000.00 per year. In May 2018, facing internal opposition to such an appointment, Pramaggiore asked McClain if Madigan would be satisfied by ComEd's giving Ochoa a part-time position that paid an equivalent amount. Plaintiffs allege "McClain told [her] that Madigan would appreciate if she would 'keep pressing' for the appointment of Ochoa as a Board Member." (Complt. ¶ 127). Pramaggiore agreed to do so, and, by April 2019, Ochoa was on the Board of Directors of ComEd. He resigned in April 2020.

### Passage of laws

Plaintiffs allege that in exchange for ComEd's favors to his cronies, Madigan stewarded through the Illinois legislature three bills that were favorable to ComEd: the Energy Infrastructure and Modernization Act ("EIMA"), the 2013 EIMA Amendments and the Future Energy Jobs Act ("FEJA"). Specifically, plaintiffs allege:

> As a quid pro quo for these bribes, Madigan used his power as Speaker to permit EIMA to be voted on by the Illinois House of Representatives in or around May 2011, and used his powers to ensure House members would vote in support.

(Complt. ¶ 119). Plaintiffs allege that Madigan's support for the bills was "crucial: no bills move in the Illinois House without Madigan's support." (Complt. ¶ 2). "Absent Madigan's

active support, which was the object and result of Defendants' corruption, EIMA would not have become law."  (Complt. ¶ 119).

Plaintiffs allege that Madigan had "outsized influence" in the Illinois House of Representatives.  (Complt ¶ 143).  Madigan, as Speaker, had "*de facto* ability to control which bills get voted on and which ones do not."  (Complt. ¶ 143).  With respect to each of 49 legislative committees in the Illinois House, Madigan, alone, decided which legislator would both serve as chair and collect the $10,000.00 per year stipend given to each chair.  Madigan used those positions to reward loyalty or punish disloyalty.  Plaintiffs allege Madigan had the power "to control the outcome of virtually all major legislation in the Assembly as well as the Senate."  (Complt. ¶ 146).

### *EIMA*

According to plaintiffs' complaint, defendants wanted EIMA to pass, because ComEd was having trouble getting projects approved by the ICC.  In 2007, ComEd had asked the ICC "to approve hundreds of millions of dollars in 'smart grid' spending."  (Complt. ¶ 154).  The ICC declined, approving only a small pilot project.  Defendants wanted EIMA to pass in order to ensure they could implement the smart-grid project and then pass the cost on to ratepayers.

Plaintiffs allege that, in February 2011, EIMA was introduced in the Illinois Senate, which passed the bill.  The bill then went to the Illinois House, which approved the bill with 67 votes, after making amendments.  The Illinois Senate voted to approve the amendments, and EIMA went to the Governor's desk.  Then-Governor Patrick Quinn ("Quinn") vetoed the bill. Plaintiffs allege that, in "order to override the veto, Speaker Madigan, ComEd, and Exelon successfully pressured ten members of the House Democratic caucus and four members of the

Senate Democratic caucus who had not originally supported the bill to vote to override the veto." (Complt. ¶ 162).

### EIMA Amendments

According to plaintiffs, at some point, ComEd asked the ICC to approve a change in how its return on invested capital would be calculated. ComEd wanted to begin earning a return in January of the year in which the money was invested, but the ICC declined. ComEd sought amendments to EIMA. Madigan, once again, "provided the votes to override" then-Governor Quinn's veto of the EIMA amendments. (Complt. ¶ 167).

### FEJA

The next bill Madigan helped to pass for defendants was FEJA. Plaintiffs allege this bill provided a $2,350,000,000.00 "earmarked subsidy" for two Exelon nuclear plants in Illinois. In addition, it required that Zero Emission Credits be purchased from Exelon.[3]

Plaintiffs allege that FEJA was "controversial" and "would not have passed without Madigan's involvement." (Complt. ¶ 181). In late 2016, the bill passed the Illinois House with 63 votes (Madigan did not vote) and the Illinois Senate with 32 votes. Unlike the other two bills plaintiffs mention in their complaint, plaintiffs do not allege that this one required an override of a Governor's veto.[4]

### Deferred prosecution agreement

Plaintiffs allege that a former ComEd employee has admitted to the bribery scheme. Specifically, plaintiffs allege that Frank Marquez ("Marquez"), who is ComEd's former Senior Vice President for Legislative Affairs, has admitted that he agreed with Hooker and Pramaggiore

---

[3] Plaintiffs do not say by whom the Zero Emission Credits were required to be purchased.
[4] The bill was signed by then-Governor Bruce Rauner. *See Village of Old Mill Creek v. Star*, Case No. 17-cv-1163, 17-cv-1164, 2017 WL 3008289 at *3 n. 8 (N.D. Ill. July 14, 2017).

to "arrange for Madigan's associates to obtain jobs, vendor subcontracts, and monetary payments—even in instances where the associates performed little or no work that they were purportedly hired to perform for ComEd—for the purpose of influencing and rewarding Madigan and to assist ComEd with respect to legislation affecting ComEd and its business." (Complt. ¶¶ 89, 95). Hooker was a 44-year ComEd employee, who retired in 2012 from his position as ComEd's Executive Vice President of Legislative and External Affairs. Pramaggiore was CEO of ComEd from about March 2012 to about May 2018. From June 1, 2018 through October 15, 2019, she was Senior Executive Vice President and CEO of Exelon Utilities.

Plaintiffs allege that ComEd has entered a deferred prosecution agreement with the United States Attorney for the Northern District of Illinois. Plaintiffs allege that, in the agreement, defendants admitted that "the reasonably foreseeable anticipated benefits to ComEd" of the legislation was at least $150,000,000.00. (Complt. ¶ 183). Under the deferred prosecution agreement, according to plaintiffs' allegations, "[d]efendants . . . accept[ed] responsibility for bribery in violation of 18 U.S.C. § 666(a)(2) and agree[d] to pay $200 million in fines to the United States Treasury." (Complt. ¶ 29).

Plaintiffs allege that defendants have benefitted from the scheme in an amount greater than the amount they are paying the United States Treasury. Plaintiffs allege that the legislation Madigan helped pass allowed defendants "to collect unjust and illegal profits from Illinois electricity customers," i.e., plaintiffs. (Complt. ¶ 226). Plaintiffs allege that the legislation allowed ComEd to charge higher rates for electricity. Plaintiffs claim they "paid over $5 billion due to the legislation." (Complt. ¶ 5).

Based on defendants' alleged conduct, plaintiffs assert claims for violation of RICO (Count I), for conspiracy (Count II), for violation of the Illinois Consumer Fraud and Deceptive

Trade Practices Act (Count III) and for unjust enrichment (Count IV).  The Citizens Utility

Board ("CUB") filed a complaint in intervention that is quite similar to plaintiffs' complaint.

CUB asserts claims for violation of RICO, 18 U.S.C. § 1962(c) (Count I); RICO conspiracy, 18

U.S.C. § 1962(d) (Count II); conspiracy (Count III); and unjust enrichment (Count IV).

## II.    STANDARD ON A MOTION TO DISMISS

The Court may dismiss a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure if the plaintiff fails "to state a claim upon which relief can be granted."  Fed.R.Civ.P.

12(b)(6).  Under the notice-pleading requirements of the Federal Rules of Civil Procedure, a

complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon

which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v.

Gibson*, 355 U.S. 41, 47 (1957)).  A complaint need not provide detailed factual allegations, but

mere conclusions and a "formulaic recitation of the elements of a cause of action" will not

suffice.  *Twombly*, 550 U.S. at 555.  To survive a motion to dismiss, a claim must be plausible.

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Allegations that are as consistent with lawful conduct as

they are with unlawful conduct are not sufficient; rather, plaintiffs must include allegations that

"nudg[e] their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

In considering a motion to dismiss, the Court accepts as true the factual allegations in the

complaint and draws permissible inferences in favor of the plaintiffs.  *Boucher v. Finance Syst.

of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018).  Conclusory allegations "are not entitled

to be assumed true," nor are legal conclusions.  *Iqbal*, 556 U.S. at 680 & 681 (noting that a "legal

conclusion" was "not entitled to the assumption of truth[;]" and rejecting, as conclusory,

allegations that "'petitioners 'knew of, condoned, and willfully and maliciously agreed to subject

[him]' to harsh conditions of confinement").  The notice-pleading rule "does not unlock the

10

doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-679.

Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, the "circumstances constituting fraud" must be alleged with particularity. Fed.R.Civ.P. 9(b).

## III.  DISCUSSION

### A.  Filed Rate Doctrine

Electricity delivery is generally considered to be a natural monopoly, which is why rates are regulated and utilities are allowed a reasonable rate of return on invested capital. In this case, plaintiffs argue they paid inflated electricity rates due to laws that passed on account of bribery.

Defendants argue that plaintiffs' claims should be dismissed as barred by the filed rate doctrine, which is the principle that the "rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 163 (1922). The filed rate doctrine "which is based on historical antipathy to rate setting by courts . . . and on a policy forbidding price discrimination by public utilities and common carriers, forbids a court to revise a public utility's or . . . common carrier's filed tariff, which is to say the terms of sale that the carrier has filed with the agency that regulates the carrier's service." *Arsberry v. Illinois*, 244 F.3d 558, 562 (7th Cir. 2001). As the Third Circuit succinctly put it, "[o]nce [the] rate is filed with the appropriate regulatory body, we have no ability to effectively reduce it by awarding damages for an alleged overcharge[.]" *Leo v. Nationstar Mortgage LLC*, 964 F.3d 213, 218 (3d Cir. 2020). This defense would seem to be a slam dunk in a case in which plaintiffs seek money damages as reimbursement for the inflated rates they paid for the electricity they used when they chose to, say, turn on their lights, cook on their electric stoves or charge their cell phones.

The Court, however, will not consider this issue on a motion to dismiss under Rule 12(b)(6). As plaintiffs point out, the filed rate doctrine is an affirmative defense. *Gunn v. Continental Casualty Co.*, 968 F.3d 802, 806 (7th Cir. 2020). Plaintiffs need not plead around an affirmative defense, and the Court may not dismiss a claim on the basis of an affirmative defense unless plaintiffs allege, and thus admit, the elements of the affirmative defense. *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613-14 (7th Cir. 2014); *United States Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 626 (7th Cir. 2003). Defendants argue that the rates plaintiffs paid for the electricity they used were filed, but they do not cite any portions of the complaint in which plaintiffs admit that. Instead, defendants cite ICC orders and argue plaintiffs cannot deny the fact that the rates were filed. It is not enough that plaintiffs did not *deny* the fact in their complaint. In order for defendants to obtain dismissal on the basis of an affirmative defense, defendants need to point to complaint allegations in which plaintiffs *admitted* the facts. They have not done so.

Plaintiffs have not alleged, and thus admitted, the ingredients of defendants' filed-rate-doctrine affirmative defense. The Court will not dismiss on the basis of that affirmative defense on a motion to dismiss under Rule 12(b)(6).

## B. RICO

### 1. Failure to state a claim

In Count I, plaintiffs asserts that defendants violated the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c). Defendants moves to dismiss for failure to state a claim, among other reasons.

RICO provides a private right of action for violations of 18 U.S.C. § 1962. 18 U.S.C. § 1964(c). In passing the RICO statute, Congress sought "to eradicate organized, long-term

criminal activity." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992).

"RICO has not federalized every common-law state cause of action" despite "widespread abuse

of civil RICO." *Midwest Grinding*, 976 F.2d at 1025. The Seventh Circuit has explained:

> The prototypical RICO case is one in which a person bent on criminal activity
> seizes control of a previously legitimate firm and uses the firm's resources,
> contacts, facilities, and appearance of legitimacy to perpetuate more, and less
> easily discovered, criminal acts than he could do in his own person, that is,
> without channeling his criminal activities through the enterprise that he has taken
> over.

*Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997). RICO has particular pleading

(and proof) requirements, because RICO is not meant to be "'a surrogate for garden-variety fraud

actions properly brought under state law.'" *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 337

(7th Cir. 2019) (quoting *Midwest Grinding*, 976 F.2d at 1022).

Plaintiffs assert a violation of 18 U.S.C. § 1962(c), which makes it "unlawful for any

person employed by or associated with any enterprise engaged in, or the activities of which

affect, interstate or foreign commerce, to conduct or participate directly in the conduct of such

enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18

U.S.C. § 1962(c). To state a claim, plaintiffs must plausibly allege "(1) conduct (2) of an

enterprise (3) through a pattern (4) of racketeering activity." *Menzies*, 943 F.3d at 336.

A "pattern of racketeering activity" is defined in the statute as "at least two acts of

racketeering activity [within a specified time period]." 18 U.S.C. § 1961(5). Racketeering

activity includes many indictable offenses, including mail and wire fraud and laundering of

monetary instruments. 18 U.S.C. § 1961(1). Wire (or mail) fraud requires allegations of a

scheme to defraud, intent to defraud and use of wires (or mail) in furtherance of the scheme.

*United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016).

As defendants point out, in order to state a claim under RICO, plaintiffs must plausibly allege that a RICO violation "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). The Supreme Court has explained:

> Proximate cause for RICO purposes, we [have] made clear, should be evaluated in light of its common-law foundations; proximate cause thus requires 'some direct relation between the injury asserted and the injurious conduct alleged.' A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient.

*Hemi Group, LLC v. City of New York, NY*, 559 U.S. 1, 9 (2010). Although the test for proximate cause under RICO has a foundation in the common law, the Supreme Court has explicitly rejected the idea that the proximate cause requirement should "turn on foreseeability, rather than on the existence of a sufficiently 'direct relationship' between the fraud and the harm." *Hemi*, 559 U.S. at 12. Instead, when "a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006); *see also Hemi*, 559 U.S. at 12 ("the focus is on the directness of the relationship between the conduct and the harm.").

In *Hemi*, for example, the City of New York sued a mail-order cigarette seller under RICO on the theory that the seller's failure to report the names of its buyers to the state of New York made it impossible for the City of New York to collect use tax from its citizens who had purchased cigarettes from the seller. It claimed the lost tax revenue as its RICO injury. The Supreme Court concluded that the City had failed to state a claim under RICO. *Hemi*, 559 U.S. at 18. It explained:

> The City's causal theory is far more attenuated than the one we rejected in *Holmes*. According to the City, Hemi committed fraud by selling cigarettes to city residents and failed to submit the required customer information to the State.

14

> Without the reports from Hemi, the State could not pass on the information to the City, even if it had been so inclined. Some of the customers legally obligated to pay the cigarette tax to the City failed to do so. Because the City did not receive the customer information, the City could not determine which customers had failed to pay the tax. The City thereby was injured in the amount of the portion of back taxes that were never collected.

*Hemi*, 559 U.S. at 9. The Supreme Court said, "the conduct directly responsible for the City's harm was the customers' failure to pay their taxes." *Hemi*, 559 U.S. at 11. "Because the City's theory of causation requires us to move well beyond the first step [of causation], that theory cannot meet RICO's direct relationship requirement." *Hemi*, 559 U.S. at 10.

Similarly, in *Anza*, the Supreme Court concluded that a plaintiff had failed to state a RICO claim, because he failed to allege the RICO violation had proximately caused his injury. There, plaintiff's theory was that defendants "harmed [plaintiff] by defrauding the New York tax authority and using the proceeds from the fraud to offer lower prices designed to attract more customers." *Anza*, 547 U.S. at 457-58. The Supreme Court concluded that the "connection between [plaintiff's] injury and [defendants'] injurious conduct" was too "attenuated." *Anza*, 547 U.S. at 459. The Supreme Court noted that defendants "could have lowered its prices for any number of reasons" and that its "lowering of prices in no sense required it to defraud the state tax authority." *Anza*, 547 U.S. at 459. It also noted that plaintiff's "lost sales could have resulted from factors other than petitioners' alleged" fraud, because "[b]usinesses lose and gain customers for many reasons[.]" *Anza*, 547 U.S. at 459.

The Seventh Circuit, too, has considered what it takes to show proximate cause in a RICO case, and it has done so with respect to facts that are similar to the allegations in this case. In *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723 (7th Cir. 2014), casino owners sued members of the horseracing industry, accusing them of having used bribery to pass two state statutes (a 2006 Act that sunset after two years and a follow-up 2008 Act) that taxed casino

15

revenue in order to subsidize the horseracing industry. On summary judgment, plaintiffs had put

forth evidence that former-governor Rod Blagojevich had taken a campaign contribution as a

*quid pro quo* for signing the '08 Act. That exchange was sufficient to show proximate causation

because:

> the '08 Act became law as a direct result of the alleged agreement to trade money
> for one person's action—the governor's signature. A jury could find that the
> causal chain between the Racetrack's bribe and the governor's signing of the bill
> was not broken by any intervening acts of third parties.

*Empress Casino*, 763 F.3d at 732.

With respect to the '06 Act, however, the Seventh Circuit reached a different conclusion.

It said:

> The Casinos have not pointed to any evidence that would allow a factfinder to
> conclude that the Racetracks' alleged bribery scheme *caused* the legislature to
> pass the '06 Act. To begin with, the Casinos make no allegation and have no
> evidence that the Racetracks ever bribed or attempted to bribe state legislators.
> Nor do the Casinos point to evidence that the governor agreed to exert *improper*
> influence over state legislators in order to win their support of the '06 Act in
> exchange for a bribe.

*Empress Casino*, 763 F.3d at 729 (emphasis added). The Seventh Circuit added that evidence of

"simple logrolling" would not suffice to show improper influence. *Empress Casino*, 763 F.3d at

729.

In this case, defendants argue that plaintiffs have not stated a claim under RICO, because

they have not alleged that their injury was proximately caused by ComEd's alleged bribe of

Madigan. Defendants, rightly, concede that plaintiffs have alleged but-for causation. Plaintiffs

have, for example, alleged that Madigan had the "*de facto* ability to control which bills get voted

on and which ones do not." (Complt. ¶ 143). That is enough to allege the bills would not have

passed but-for Madigan. It is not, however, enough to allege proximate causation, because it is

not enough to show that the bribery of Madigan was the proximate cause of the bills' ultimate

16

passage. Plaintiffs' allegations are different as to each bill, so the Court considers each bill in turn.

With respect to FEJA, plaintiffs allege the bill was "controversial" and "would not have passed without Madigan's involvement." (Complt. ¶ 181). That is enough to allege but-for causation, but it is not enough to establish proximate causation. True, Madigan brought FEJA up for vote, but two more things had to happen before the bill became law, and plaintiffs do not allege the bribe of Madigan caused those other things to happen. First, plaintiffs allege that, in late 2016, the bill passed the Illinois House (of which Madigan constitutes a single member) with 63 votes (Madigan did not vote) and the Illinois Senate (of which Madigan is not a member) with 32 votes. Plaintiffs have not alleged that the bribe of Madigan caused the members to vote in favor, because, just as with the '06 Act in *Empress Casino*, plaintiffs have not plausibly alleged that Madigan *improperly* influenced the other legislators who voted to pass the bill. Although plaintiff has alleged that Madigan had power over committee assignments, endorsements and fundraising, these allegations are consistent with lawful conduct. *See Twombly*, 550 U.S. at 570 (plaintiffs must include allegations that "nudg[e] their claims across the line from conceivable to plausible."). As the Seventh Circuit explained in *Empress Casino*:

> T]he usual give-and-take of legislative lawmaking[] might explain the change in outcome. . . . If the promise referred to support for re-election, or a commitment to co-sponsor a bill, without any taint of bribery, nothing would be wrong.

*Empress Casino*, 763 F.3d at 730. "[S]imple logrolling . . . falls short of evidence that could support a RICO claim." *Empress Casino,* 763 F.3d at 729.

The second thing that happened before the bill became law is the governor's signature on the bill. Plaintiffs omit from their complaint any mention of whether anything else was involved in the process of passing FEJA, but the Court can take judicial notice of the fact that then-

Governor Bruce Rauner signed FEJA into law. Plaintiffs have not alleged that the bribery of Madigan caused Governor Rauner to sign FEJA into law.

Next, plaintiffs allege that Madigan was a but-for cause with respect to the passage of EIMA and the EIMA Amendments. Once again, though, plaintiffs' allegations fall short of proximate causation. Although plaintiffs allege Madigan brought the bill to the legislature, plaintiffs fail to allege that the bribe of Madigan caused the members of the Illinois House and Senate to vote in favor of EIMA. Plaintiffs also allege that the Illinois legislature had to override a veto by then-Governor Quinn. Plaintiffs allege that, in "order to override the veto, Speaker Madigan, ComEd, and Exelon successfully pressured ten members of the House Democratic caucus and four members of the Senate Democratic caucus who had not originally supported the bill to vote to override the veto." (Complt. ¶ 162). What plaintiffs fail to allege is what pressure was put on legislators. If, by pressure, plaintiffs mean logrolling, committee assignments or help with reelection, then that does not suffice. Plaintiffs fail to allege that Madigan put any *improper* pressure on those lawmakers.

The same is true of plaintiffs' allegations as to the EIMA Amendments. Plaintiffs allege only that Madigan "provided the votes to override" then-Governor Quinn's veto of the EIMA amendments. (Complt. ¶ 167). Plaintiffs do not, however, say how. Once again, if plaintiffs mean merely that Madigan logrolled or used the usual give-and-take of the legislative process, it is not sufficient. To state a claim, plaintiffs need to allege Madigan provided the votes by placing *improper* pressure on lawmakers.

In short, plaintiffs have not included in their complaint sufficient allegations to allege plausibly that the RICO violation was a proximate cause of their injuries. Conceivably, plaintiffs could amend to cure the defect (though whether they could do so within the bounds of Rule 11

18

is, of course, a different question). Whether they should be allowed to file such an amendment depends on whether a "cure" for the alleged bribery may "lie in civil litigation." The Court considers that issue next.

### 2. *Fletcher v. Peck*

Defendants, relying on *Fletcher v. Peck*, also argue that this issue should not be the subject of civil litigation. Plaintiffs counter that *Fletcher v. Peck* is "forgotten"[5] and that the facts are different. Plaintiffs are at least half right. *Fletcher* did not involve electricity rates. When Chief Justice John Marshall wrote *Fletcher v. Peck*, it was not by the light of an Edison bulb, which would not be invented for another seventy years. The question is not whether the facts are the same but whether the principle is, as defendants argue, applicable here.

*Fletcher v. Peck*, 10 U.S. 87 (1810) involved a contract for the sale of land between two private individuals. When Peck deeded land to Fletcher it was with a covenant that Peck had conveyed all the title that the State of Georgia had held in the land. Unfortunately, the law that had allowed Georgia to transfer the land to a prior owner had been procured by bribery, which led Fletcher to argue the convenant was breached. The Supreme Court said they would not consider the issue, explaining:

> That corruption should find its way into the governments of our infant republics, and contaminate the very source of legislation, or that impure motives should contribute to the passage of a law, or the formation of a legislative contract, are circumstances most deeply to be deplored. How far a court of justice would, in any case, be competent, on proceedings instituted by the state itself, to vacate a contract thus formed, and to annul the rights required, under that contract, by third persons having no notice of the improper means by which it was obtained, is a question which the court would approach with much circumspection. . . . If the principle be conceded, that an act of the supreme sovereign power might be declared null by a court, in consequence of the means which procured it, still would there be much difficulty in saying to what extent those means mu[st] be applied to produce this effect. . . . Must the vitiating cause

---

[5] Docket 98-1 at 6/Plfs. Surreply at 1.

operate on the majority, or on what number of the members? Would the act be null, whatever might be the wish of the nation, or would its obligation or nullity depend upon the public sentiment?

If the majority of the legislature be corrupted, it may well be doubted, whether it be within the province of the judiciary to control their conduct, and, if less than a majority act from impure motives, the principle by which judicial interference would be regulated, is not clearly discerned.

*Fletcher*, 10 U.S. at 130. It went on to say:

This is not a bill brought by the state of Georgia, to annul the contract, nor does it appear to the court, by this count, that the state of Georgia is dissatisfied with the sale that has been made. The case . . . is simply this. One individual who holds lands in the state of Georgia, under a deed covenanting that the title of Georgia was in the grantor, brings an action of covenant upon this deed, and assigns, as a breach, that some of the members of the legislature were induced to vote in favour of the law, which constituted the contract, by being promised an interest in it, and that therefore the act is a mere nullity.

This solemn question cannot be brought thus collaterally and incidentally before the court. It would be indecent, in the extreme, upon a private contract, between two individuals, to enter into inquiry respecting the corruption of the sovereign power of a state. If the title be plainly deduced from a legislative act, which the legislature might constitutionally pass, if the act be clothed with all the requisite forms of a law, *a court*, sitting as a court of law, *cannot sustain a suit brought by one individual against another founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law.*

*Fletcher*, 10 U.S. at 130-31 (emphasis added).

In the meantime, *Fletcher* has not been forgotten. The Seventh Circuit, within the last decade, has considered whether *Fletcher* applies to a strikingly-similar factual situation. In *Empress Casino*, the Seventh Circuit thought *Fletcher* an important enough issue to mention. There, the Seventh Circuit described as a "questionable proposition" whether a RICO claim could be based on allegations that a governor used bribery to get a bill through a legislature. *Empress Casino*, 763 F.3d at 728. There, the Seventh Circuit explained both why that was questionable and why the court did not need to decide the issue, saying:

20

The work of state legislatures lies at the heart of the 'Republican Form of Government' that the Constitution mandates. U.S. Const. Art. IV, § 4; *see also the Federalist No. 51* (James Madison) ("In the republican government, the legislative authority necessarily predominates."). The evidence would have to be extraordinary to conclude that one corrupt official, whether the governor or anyone else, had hijacked this foundational institution of state sovereignty. *And even if the evidence were strong, the cure may not lie in civil litigation in the courts.* [Citing and quoting *Fletcher v. Peck*.] We do not need to explore the outer boundaries of the *Fletcher* holding here, because this record is devoid of admissible evidence that the governor exerted undue influence on the legislators as they considered the '06 Act.

*Empress Casino*, 763 F.3d 730-31 (emphasis added).[6]

Here, as in *Fletcher*, it is not the State of Illinois that objects to how the law was passed. As in *Fletcher*, the Court has no reason to think the State of Illinois is unhappy with the law. Nor does the Court have any reason to think the constituents are unhappy with the law. In a state with an electorate that expresses concern about climate change, perhaps the constituents preferred to subsidize reliable, zero-emission nuclear power so that it could compete with federally-subsidized but intermittent wind or solar power. Perhaps the constituents wanted a modernized energy-delivery system. The legislature is the branch of government most responsive to the electorate. This Court shares *Fletcher's* concern about a court, in effect, overruling the decisions of a State legislature based on the alleged improper motives of the legislature.

Here, as in *Fletcher*, we have a dispute between private parties. In this case, plaintiffs allege they purchased electricity (and the delivery thereof) from their public utility (defendant ComEd) and its owner (Exelon) at rates that were inflated due to laws that were passed through a

---

[6] Plaintiffs discount the Seventh Circuit's concerns about *Fletcher*, arguing that, in *Empress Casino*, the Seventh Circuit allowed the claims about the '08 Act to proceed. The Court disagrees. The claims on the '08 Act proceeded, because they involved *executive* action (the governor was bribed to sign the '08 Act), not *legislative* action. *Fletcher* simply did not apply.

State legislature.  Plaintiffs allege that the passage of those laws was tainted by the bribery of the Speaker of the House, and that, accordingly, plaintiffs should be reimbursed for the difference between the inflated rates they paid and the rates they would have paid had the laws not been passed.  True, plaintiffs are not arguing that EIMA, the EIMA Amendments or FEJA are nullities.  They are arguing they should be reimbursed for the effect those laws had on the rates they paid for electricity.  Plaintiffs believe that any amounts defendants were able to collect from plaintiffs (in the form of higher rates for the electricity plaintiffs used) on account of the three laws should be given back to the plaintiffs in the form of damages on a RICO claim.  How, though, is that different from nullifying those laws?  Plaintiffs are certainly arguing that the rates—that are a product of those State laws—are nullities.  The plaintiffs want this Court to order defendants to reimburse plaintiffs for those increased rates in the form of damages on a civil claim.  The State legislature giveth, and the federal court taketh away.  The effect to plaintiffs is essentially the same as nullifying the State law, all based on the motives of the legislators.  In essence, plaintiffs' RICO claim is a collateral attack on three Illinois laws.

The problems with such a claim are those that the Supreme Court worried about in *Fletcher v. Peck*.  It is not possible to determine the merits of the RICO proximate cause issue without considering the motives of the legislators who voted for the bill.  By contemplating the motives of the legislators who voted for the bill, the Court would be violating *Fletcher v. Peck.*

The Court fails to see how it can "sustain" the RICO claim in light of *Fletcher v. Peck*.  Accordingly, it would be futile to give plaintiffs leave to amend their RICO count.  Count I is dismissed with prejudice.

Because the Court is dismissing the only claim over which it has original jurisdiction, it declines to exercise supplemental jurisdiction over plaintiffs' remaining state-law claims.  *See*

*Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015) ("The general rule, when the federal claims fall out before trial, is that the [district court] should relinquish jurisdiction over any supplemental . . . state law claims in order to minimize federal judicial intrusion into matters of purely state law.") (citation omitted) .  Counts II, III and VI are dismissed without prejudice.

Citizens Utility Board's Count I is the same as plaintiffs' Count I.  It is dismissed with prejudice for the same reasons.  CUB's Count II is a RICO conspiracy claim under 18 U.S.C. § 1962(d).  It is dismissed for the same reasons.  *See United Food and Commercial Workers Unions and Employers Midwest Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856-57 (7th Cir. 2013) ("Having failed to plead facts that would establish a violation of Section 1962(c), the [plaintiff] cannot state a claim for conspiracy under Section 1962(d) based on those same facts.").  The Court relinquishes jurisdiction over CUB's remaining state-law claims. Accordingly, Counts III and IV are dismissed without prejudice.

## IV.    CONCLUSION

For the reasons set forth above, the Court grants plaintiffs' motion [98] for leave to file surreply.  The Court grants defendants' motion [84] to dismiss.  Plaintiffs' Count I is dismissed with prejudice.  The Court relinquishes jurisdiction over plaintiffs' Counts II, III and IV, which are dismissed without prejudice.  Intervenor Citizens Utility Board's Counts I and II are dismissed with prejudice.  The Court relinquishes jurisdiction over intervenor Citizens Utility Board's Counts III and IV, which are dismissed without prejudice.  Civil case terminated.

**SO ORDERED.**                                             **ENTERED: September 9, 2021**

<br>

_____
**HON. JORGE ALONSO**
**United States District Judge**