In the

# United States Court of Appeals

### For the Seventh Circuit

CERTIFIED COPY
A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

Nos. 21-2861, 21-2872 & 21-2873

SOUTH BRANCH LLC, *et al.*,

           *Plaintiffs-Appellants*,

*v.*

COMMONWEALTH EDISON COMPANY and EXELON CORPORATION,

           *Defendants-Appellees*.

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 1:20-cv-4980, -4405 & -4555 — **Jorge L. Alonso**, *Judge*.

_____

ARGUED MAY 17, 2022 — DECIDED AUGUST 22, 2022

_____

Before SYKES, *Chief Judge*, and KIRSCH and JACKSON-AKIWUMI, *Circuit Judges*.

KIRSCH, *Circuit Judge*. Nine Illinois energy consumers sued their electricity provider, Commonwealth Edison Company, and its parent, Exelon Corporation, on behalf of themselves and those similarly situated for damages under the Racketeer Influenced and Corrupt Organizations Act (RICO) alleging injury from increased electricity rates. These rates increased,

the plaintiffs allege, because ComEd bribed the former Illinois Speaker of the House to shepherd three bills through the state's legislature. The district court dismissed the suit. Because paying a state's required filed utility rate is not a cognizable injury for a RICO damages claim, we affirm.

I

Since we are reviewing a dismissal on the pleadings, we treat the following well-pleaded facts in the complaint as true. See *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021). When appropriate, we also cite matters of public record not subject to reasonable dispute for which we take judicial notice. See *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1044 (7th Cir. 2019).

Exelon Corporation is a utility services holding company engaged in the energy distribution and transmission business across multiple states through several subsidiaries, including Commonwealth Edison Company.[1] ComEd purchases, transmits, distributes, and sells electricity to retail customers in northern Illinois. As an Illinois public utility, ComEd must file its electricity rates with the Illinois Commerce Commission (ICC). See 220 Ill. Comp. Stat. §§ 5/9-102, 5/9-104.

To secure passage of favorable legislation, ComEd engaged in a yearslong "pay to play" scheme with Michael Madigan, the former Speaker of the Illinois House of Representatives and Chair of the Illinois Democratic Party. Through that scheme, ComEd paid bribes to Madigan's associates, and, in return, Madigan used his roles as Speaker and Party Chair to push advantageous bills through the state legislature. As

---

[1] Except where otherwise noted, this opinion generally refers to the defendants collectively as ComEd.

relevant here, three bills became law during the ComEd-Madigan scheme: (1) the Energy Infrastructure and Modernization Act of 2011 (EIMA); (2) 2013 amendments to that legislation; and (3) the Future Energy Jobs Act of 2016 (FEJA).

First, in 2011, ComEd paid three Madigan connections indirectly as subcontractors for little or no work, contracted with a Madigan-affiliated law firm, and hired paid interns from Madigan's ward, to influence Madigan to secure the passage of EIMA. In return, Madigan used his power as Speaker to permit the House of Representatives to vote on the bill and to ensure House members would vote in support. The House approved the bill, with 67 of 116 representatives voting for its passage. The Senate then approved the bill as well, with 31 of 55 senators voting in its favor.

When the bill reached the governor's desk, however, Governor Pat Quinn vetoed it. So Madigan again used his powers and influence to permit a vote overriding the veto and to urge support of the override. That effort succeeded after Madigan pressured ten members of the House Democratic caucus and four members of the Senate Democratic caucus who had not originally supported the bill to vote to override the veto.

Once enacted, EIMA weakened the role of the ICC. Although Illinois law still required public utilities to file rates with the ICC, EIMA implemented statutorily prescribed, performance-based rate increases that limited the ICC's discretion in reviewing rates. EIMA also authorized at least $2.6 billion in ComEd spending on smart meters and smart grid infrastructure, costs that were required to be passed on to customers.

Second, in 2013, ComEd secured amendments to EIMA that further curbed the ICC's regulatory authority and protected ComEd's profit margins. The General Assembly again passed the legislation over Governor Quinn's veto, and Madigan provided the votes to do it.

And third, in 2016, ComEd had Madigan usher FEJA through the General Assembly. Madigan's top advisers and ComEd's lobbyists handpicked lawmakers to vote on the bill in the House legislative committee. After ComEd identified six Democratic committee members who were likely to vote against the bill, Madigan removed them from the committee and replaced them with lawmakers more favorable to the legislation. The bill passed 16-0 out of committee and went on to pass in the House (63 out of 101 votes) and the Senate (32 out of 50 votes). Governor Bruce Rauner signed the bill into law.

FEJA provided $2.35 billion in funding for nuclear power plants operated by Exelon paid for through a new fee for utility customers based on a Zero Emissions Credits system. Under that system, the Illinois Power Agency procures these Credits from zero-emissions utilities (such as Exelon's nuclear power plants). Public utilities like ComEd must purchase the Credits from the Power Agency at a statutory rate. And ComEd then passes that cost on at a flat per-kilowatt hour rate to all retail customers. Illinois electricity consumers pay $235 million annually for the Zero Emissions Credit system, and FEJA authorized the system to last at least ten years. FEJA also allowed ComEd to charge ratepayers for all energy efficiency programs and for some expenses relating to employee incentive compensation, pensions, and other post-employment benefits.

Because of these three pieces of legislation, Illinois electricity consumers have had to pay more for electricity. The plaintiffs sued ComEd and Exelon on behalf of themselves and those similarly situated, bringing a federal RICO claim and several state-law claims. ComEd moved to dismiss the federal RICO claim under Federal Rule of Civil Procedure 12(b)(6), arguing that (1) the complaint failed to allege enough for proximate causation; (2) the court could not award damages under the filed rate doctrine; and (3) *Fletcher v. Peck*, 10 U.S. 87 (1810), required dismissal.

Based on ComEd's first and third arguments, the district court granted this motion. It dismissed the civil RICO claim with prejudice and declined to exercise jurisdiction over the remaining state-law claims. The plaintiffs have appealed the dismissal of their RICO claim.

II

We start and end with what the district court passed over: the filed rate doctrine. See *Smith v. RecordQuest, LLC*, 989 F.3d 513, 517 (7th Cir. 2021) ("[W]e may affirm on any basis in the record.") (citation omitted). Although the district court mentioned this doctrine as a potential "slam dunk" for ComEd, the court thought it inappropriate to address at the Rule 12(b)(6) stage since we've said that the filed rate doctrine is an affirmative defense properly addressed through a Rule 12(c) motion for judgment on the pleadings. See *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020). But since the district court had before it all that was needed to rule on the defense, we construe ComEd's motion arguing for dismissal based on the filed rate doctrine as a motion for judgment on the pleadings under Rule 12(c) and proceed to consider it below. See *id.*

at 807; *Walczak v. Chicago Bd. of Educ.*, 739 F.3d 1013, 1016 n.2 (7th Cir. 2014).

Before turning to our analysis of the plaintiffs' federal RICO claim, we explain the significance of a utility's rate filing in Illinois (where ComEd operates). Effectively, a filed rate has the force and effect of a legislative statute. Illinois requires electricity utilities to file tariffs, which set "forth services being offered; rates and charges with respect to services; and governing rules, regulations, and practices relating to those services," with the ICC. *Adams v. N. Illinois Gas Co.*, 809 N.E.2d 1248, 1263 (Ill. 2004); see 220 Ill. Comp. Stat. § 5/9-102. Utilities must charge no more or less than the rates filed in their tariffs. See 220 Ill. Comp. Stat. § 5/9-240 ("Except as in this Act otherwise provided, no public utility shall charge, demand, collect or receive a greater or less or different compensation … than the rates or other charges applicable … as specified in its schedules on file and in effect at that time, … nor shall any such public utility refund or remit … any portion of the rates or other charges so specified … ."). Under a rule known as the filed rate doctrine, Illinois state courts cannot adjust rates that have been filed with the appropriate regulator for any reason. See *Sheffler v. Commonwealth Edison Co.*, 955 N.E.2d 1110, 1119 (Ill. 2011); *Adams*, 809 N.E.2d at 1263. As explained by the Illinois Supreme Court, when a tariff filed with the ICC speaks to a utility's specific duty, then "the tariff controls," *Sheffler*, 955 N.E.2d at 1121, and it has "the force and effect of a statute," *Adams*, 809 N.E.2d at 1263 (citation omitted).

Federal courts, too, have long applied the filed rate doctrine to bar judicial adjustments of rates filed with regulators. See *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 163 (1922) (listing cases); *Montana-Dakota Utilities Co. v. Nw. Pub. Serv.*

*Co.*, 341 U.S. 246, 251 (1951) ("It can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission, and not even a court can authorize commerce in the commodity on other terms."). And although the Supreme Court developed the federal doctrine in suits involving rates filed with federal regulators, see *Keogh*, 260 U.S. at 160; *Montana-Dakota Utilities Co.*, 341 U.S. at 248, circuit courts, including our own, have uniformly held it applies when rates are filed with state regulators as well, see, e.g., *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000) (applying doctrine to rates approved by state public utility commission); *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 261 (2d Cir. 2015) ("The doctrine … protects rates approved by federal or state regulators."); *Leo v. Nationstar Mortg. LLC*, 964 F.3d 213, 214 (3d Cir. 2020); *Texas Com. Energy v. TXU Energy, Inc.*, 413 F.3d 503, 509 (5th Cir. 2005); *Crumley v. Time Warner Cable, Inc.*, 556 F.3d 879, 881 (8th Cir. 2009) (per curiam); *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1275 (9th Cir. 2022); *Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 886 (10th Cir. 2011); *Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1317 (11th Cir. 2018).

The plaintiffs acknowledge that the rates they paid to ComEd were filed with the ICC. And although that would seem to trigger the filed rate doctrine's bar on judicial adjustments to filed utility rates, the plaintiffs seek monetary damages (and not declaratory or equitable relief) for "overpay[ment] for electricity" from ComEd under RICO. See 18 U.S.C. § 1964(c). In effect, they request a federal judgment retroactively adjusting the electricity rates they paid. To allow such a claim to proceed, we would need to hold that the filed rate doctrine has been displaced by RICO. We must therefore decide whether Congress, in passing the broadly applicable

civil RICO statute, authorized federal courts to award damages in contravention of the filed rate doctrine. We hold that it did not.

RICO allows for civil damages only when a person has been "injured in his business or property." 18 U.S.C. § 1964(c). Congress modeled RICO's private civil-action provision on that of the federal antitrust statute: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor … ." 15 U.S.C. § 15(a); see *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) ("We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4. … It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them."). In interpreting that provision, the Supreme Court held that the statute's use of "injured" requires the "violation of a *legal* right." *Keogh*, 260 U.S. at 163 (emphasis added); see also *Injury*, Black's Law Dictionary (11th ed. 2019) (defining "injury" to mean "[t]he violation of another's *legal right*, for which the law provides a remedy") (emphasis added). Applying that interpretation, the Supreme Court held that when a company paid a carrier's rate that had been filed with a federal regulator, it had not been "injured" as required by the antitrust law's private civil action provision for damages. *Keogh*, 260 U.S. at 163–65. It reasoned that "[t]he legal rights" between a railroad, as a common carrier, and its customer were "measured by the published tariff," and the rate included in that tariff was "for all purposes, the legal rate" that could not "be varied or enlarged by either contract or tort of the carrier." *Id.* at 163. More than half a century later, the

Supreme Court reaffirmed *Keogh*. See *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 423 (1986) ("The emergence of subsequent procedural and judicial developments does not minimize *Keogh*'s role as an essential element of the settled legal context in which Congress has repeatedly acted in this area.").

More recently, the en banc Eleventh Circuit applied *Keogh*'s reasoning in a RICO case closely resembling ours. In *Taffet v. S. Co.*, 967 F.2d 1483, 1485 (11th Cir. 1992) (en banc), a class of utility customers brought a RICO claim against electric utilities that had fraudulently obtained rate increases from state public service commissions. After analyzing *Keogh*, the *Taffet* court held that the customers had failed to state a viable RICO claim for damages because they had suffered no "legally cognizable injury by virtue of paying the filed rate." *Id.* at 1488–94. Besides the Eleventh Circuit, at least three other circuits have employed the filed rate doctrine in dismissing RICO damages suits. See, e.g., *Rothstein*, 794 F.3d at 259; *Leo*, 964 F.3d at 218; *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 486, 495 (8th Cir. 1992).

We join these circuits and hold that the filed rate doctrine forecloses the plaintiffs' RICO claim for damages. Setting retail utility rates is traditionally a matter of state concern, and Illinois has long provided for the ICC's exclusive regulation of retail electricity rates. See *Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983) ("[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States."); Joseph D. Kearney & Thomas W. Merrill, *The Great Transformation of Regulated Industries Law*, 98 Colum. L. Rev. 1323, 1354–55 (1998) ("The generation and distribution of

electricity have traditionally been regulated by state public utility commissions … ."); 220 Ill. Comp. Stat. § 5/9-240 (first adopted in 1921). We typically presume that a federal statute does not preempt or disrupt a state's legal or regulatory regime in areas traditionally associated with state police power without stating so clearly. See *Bond v. United States*, 572 U.S. 844, 858 (2014) ("It has long been settled … that we presume federal statutes do not … preempt state law … ."); *id.* ("[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers") (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)) (cleaned up). Likewise, we generally understand Congress to speak clearly when it seeks to unsettle long-rooted legal policies. See, e.g., *United States v. Wilson*, 503 U.S. 329, 336 (1992) ("It is not lightly to be assumed that Congress intended to depart from a long established policy.") (citation omitted); *Square D Co.*, 476 U.S. at 418–19 (looking for evidence that a 1980 statute had changed or "supplant[ed] the *Keogh* rule" and the filed rate doctrine). If RICO was meant to allow claims like the plaintiff's—a claim which threatens to substitute a long-rooted state policy in favor of judicially imposed electricity rates courtesy of the federal courts—one would expect the statute to say something to that effect. Yet RICO is silent on this front.

Moreover, disregarding the filed rate doctrine would risk entangling courts in quintessentially legislative judgments. See *Sheffler*, 955 N.E.2d at 1119 ("Setting utility rates is a legislative function."); *Adams*, 809 N.E.2d at 1266 ("The fixing of rates is not a judicial function.") (citations omitted); *Minnesota Rate Cases*, 230 U.S. 352, 433 (1913) ("The rate-making power is a legislative power and necessarily implies a range of

legislative discretion."). We are not in the business of second-guessing legislative judgment calls. See *Fletcher v. Peck*, 10 U.S. at 136 ("It is the peculiar province of the legislature to prescribe general rules for the government of society."); *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 377 (1991) (noting that courts "have consistently sought to avoid" the "deconstruction of the governmental process and probing of the official 'intent'"). If this suit were allowed to proceed, the plaintiffs could not rest on their allegations as they can here at the motion-to-dismiss stage; they would need to conduct discovery for facts supporting their contention that ComEd's bribery of Madigan directly caused the three pieces of legislation to pass. See *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459–60 (2006) (civil RICO damages claim requires "a direct causal connection" between the predicate offense and the alleged harm). That would necessarily involve probing the motives of individual state legislators who voted to enact the legislation to understand Madigan's influence on them. Yet judicial tribunals rarely dive so deeply into the legislative process or into legislators' motives. See *Fletcher*, 10 U.S. at 130 ("If the majority of the legislature be corrupted, it may well be doubted, whether it be within the province of the judiciary to control their conduct, and, if less than a majority act from impure motives, the principle by which judicial interference would be regulated, is not clearly discerned."); *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951) (noting that *Fletcher* held it "not consonant with our scheme of government for a court to inquire into the motives of legislators"); cf. *City of Columbia*, 499 U.S. at 377 n.6 (citing a "very limited and well-defined class" of constitutional cases where the court proceeds otherwise).

Still, the plaintiffs offer two arguments against applying the filed rate doctrine in this case. First, they contend that this case involves only RICO damages and thus does not directly request rate adjustments. And second, the plaintiffs contend that the filed rate doctrine no longer applies because the Illinois legislation functionally eliminated the ICC's role.

Neither point persuades us. Determining a damages award here based on the alleged overpayment for electricity would involve asking what the reasonable rate should have been had the three pieces of legislation not been passed. And the filed rate doctrine bars such judicial determinations of reasonable utility rates. See *Goldwasser*, 222 F.3d at 402 (holding that the plaintiff could not pursue a damages claim because it "necessarily implicate[d] the rates [the utility] [wa]s charging," which was barred by the filed rate doctrine); *H.J. Inc.*, 954 F.2d at 494 (rejecting the plaintiffs' argument that a RICO damages action did not involve ratemaking activities because "RICO damages can only be measured by comparing the difference between the rates the Commission originally approved and the rates the Commission should have approved absent the conduct of which the class complains"); see also *Montana-Dakota Utilities Co.*, 341 U.S. at 246 (highlighting the problems with judicial determinations of "what the reasonable rates during the past should have been"); *Keogh*, 260 U.S. at 164 (suggesting that any attempt to reassess the reasonableness of rates would require the judiciary to "reconstitut[e] the whole rate structure" of the industry). As the Second Circuit expressed in a similar case, "the fact that the remedy sought can be characterized as damages … does not negate the fact that the court would be determining the reasonableness of rates." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 21 (2d Cir. 1994).

For the plaintiffs' second argument based on limits to the ICC's role, they have pointed to no case tying the filed rate doctrine's application to the breadth of a regulator's authority, and we have found none. See, e.g., *Goldwasser*, 222 F.3d at 402 (filed rate doctrine applied even when public utility commissions only "nominally overs[aw] … rate-setting" and "rarely exercise[d] their muscle and thus g[ave] no meaningful review to the rate structure"); *Town of Norwood v. New Eng. Power Co.*, 202 F.3d 408, 419 (1st Cir. 2000) ("It is the *filing* of the tariffs, and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine."); *McCray v. Fid. Nat. Title Ins. Co.*, 682 F.3d 229, 238 (3d Cir. 2012) ("[T]he Supreme Court has never indicated that the filed rate doctrine requires a certain type of agency approval or level of regulatory review. Instead, the doctrine applies as long as the agency has in fact authorized the challenged rate."); *Texas Com. Energy*, 413 F.3d at 509–10 (holding that the filed rate doctrine applies even when market forces set prices); *Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 871 (9th Cir. 2013) ("meaningful review" by agency is "not a prerequisite to the application of the filed rate doctrine"). In any event, the ICC still retains an important role in utility rate regulation. Under EIMA and the 2013 amendments to it, the ICC still has to review a public utility's rate filing and "enter an order approving, or approving as modified, the performance-based formula rate … as just and reasonable" using "evidentiary standards … concerning the prudence and reasonableness of the costs incurred by the utility." 220 Ill. Comp. Stat. § 5/16-108.5(c). And under FEJA, the ICC has to review and approve the charges imposed by the Zero Emissions Credits system before they are passed on to electricity customers. See *id.* § 3855/1-75. Moreover, recently enacted Illinois law requires the ICC to

investigate whether ComEd used any ratepayer funds to pay for fines related to the alleged bribery scheme. See *id.* § 5/4-604.5(b). If the ICC concludes that ComEd did so, ComEd must pay a refund to ratepayers for that amount spent, *id.*, the exact form of relief we are unable to award here.

At bottom, when the plaintiffs paid their electricity bills based on rates which had been properly filed with the ICC, they paid the state's required legal rate. Based on our above analysis, we hold that the plaintiffs suffered no legally cognizable injury by paying this legal rate and thus were not "injured in [their] business or property," as required to pursue a claim for damages under § 1964(c) of RICO.

AFFIRMED

Nos. 21-2861, 21-2872, & 21-2873 15

JACKSON-AKIWUMI, *Circuit Judge*, concurring. I concur solely on the ground that plaintiffs' claims are foreclosed by *Fletcher v. Peck*, 10 U.S. 87 (1810), as the majority explains, *see ante* 10–11, and as resolved by the district court. If this suit proceeded, plaintiffs "would need to conduct discovery for facts supporting their contention that ComEd's bribery of Madigan directly caused the three pieces of legislation to pass." *Ante* 11. The subsequent resolution of their claims after discovery "would necessarily involve [a court] probing the motives of individual state legislators who voted to enact the legislation to understand Madigan's influence on them," which *Fletcher* prohibits. *Ante* 11; *see also Tenney v. Brandhove*, 341 U.S. 367, 377 (1951). Accordingly, I would have resolved the matter on this basis alone and not reached the filed-rate affirmative defense.